# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
### CASE NO. 12-16489-CC

IN RE:

**CUSTOM CONTRACTORS, LLC,**

     **Debtor.**

_____/

**DEBORAH C. MENOTTE,**

     **Appellant,**

vs.

**UNITED STATES OF AMERICA,**

     **Appellee.**

_____/

On Appeal From The United States District Court
Southern District of Florida
District Court Case No. 9:12-cv-80664-KMM
United States Bankruptcy Court, Southern District of Florida
Adv. Case No. 10-03455-PGH, Main Case No. 09-24404-BKC-PGH

**INITIAL BRIEF OF APPELLANT DEBORAH C. MENOTTE**

GREENSPOON MARDER, P.A.
MICHAEL R. BAKST, ESQ.
Florida Bar No.: 866377
G. STEVEN FENDER, ESQ.
Florida Bar No.: 060992
Attorneys for Appellant
Deborah C. Menotte
250 S. Australian Ave., Suite 700
West Palm Beach, FL 33401
Telephone: (561) 838-4509
Facsimile: (561) 653-3937

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT
## <u>MENOTTE V. UNITED STATES, CASE NO. 12-16489</u>

Pursuant to 11th Cir. R. 26.1-1, Appellant Deborah C. Menotte, as Chapter 7 Trustee in Bankruptcy for Custom Contractors, LLC, submits the following list which identifies all judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that may have an interest in the outcome of this appeal:

1. Bakst, Michael R., Esq. , Attorney for Appellant

2. Carnahan, Rilyn A., Esq., Attorney for Appellant

3. Custom Contractors, LLC, Debtor

4. Doyle, Philip A., Esq., Attorney for Appellee

5. Fender, G. Steven, Esq., Attorney for Appellant

6. Greenspoon Marder, P.A., Law Firm for Appellant

7. Hyman, Honorable Paul G., Jr., Bankruptcy Judge

8. Menotte, Deborah C., Appellant

9. Moore, Honorable K. Michael, District Judge

10. Rosenberg, Kenneth W., Esq., Attorney for Appellee

11. Ruden McClosky, P.A., Law Firm for Appellant

12. United States of America, Appellee

13. Wollitzer, Rachel I., Esq., Attorney for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant Deborah C. Menotte requests oral argument because she believes it would assist the Court in deciding this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
     DISCLOSURE STATEMENT MENOTTE v. UNITED STATES,
     CASE NO. 12-16489 .................................................................................2

STATEMENT REGARDING ORAL ARGUMENT.................................................i

TABLE OF CONTENTS.........................................................................................ii

TABLE OF CITATIONS........................................................................................iii

STATEMENT REGARDING ADOPTION OF BRIEFS
     OF OTHER PARTIES.................................................................................vi

STATEMENT OF SUBJECT-MATTER AND APPELLATE
     JURISDICTION ..........................................................................................vi

STATEMENT OF ISSUES ......................................................................................1

STATEMENT OF THE CASE..................................................................................1

    A.  Course of Proceedings and Dispositions in the Courts Below.......................1

    B.  Statement of the Facts...................................................................................3

    C.  Standard of Review.....................................................................................13

SUMMARY OF THE ARGUMENT .....................................................................14

ARGUMENT .........................................................................................................16

    A.  The United States Is Not a "Mere Conduit" under § 550(a). .......................16

    B.  Economic Conditions in 2007 and the Facts Surrounding the
        Debtor's Formation are not "Irrelevant" as "Hindsight Bias." ...................29

CONCLUSION.......................................................................................................33

CERTIFICATE OF COMPLIANCE UNDER F.R.A.P. 32(a)(7)...........................34

CERTIFICATE OF SERVICE ...............................................................................35

## TABLE OF CITATIONS

**Cases**                                                                              **Page(s)**

*Andreini & Co. v. Pony Express Delivery Services, Inc.*
  *(In re Pony Express)*, 440 F.3d 1296 (11th Cir. 2006)........................................ 20

*Boyer v. Crown Stock Distr., Inc.,*
  587 F.3d 787 (7th Cir. 2009) ................................................................. 12, 30, 31

*Crawford v. Department of Treasury (In re Crawford),*
  2001 WL 1136919 (Bankr. W.D. Wis., Case No. 00-34046-13,
  July 23, 2001)..................................................................................... 26-27

*Ewing v. United States (In re Ewing),*
  400 B.R. 913 (Bankr. N.D. Ga. 2008) ............................................................ 27

*Henkel v. United States (In re Carpenter),*
  367 B.R. 850 (Bankr. M.D. Fla. 2006)............................................................ 25

*In re Owen,*
  86 B.R. 691 (Bankr. M.D. Fla. 1988), *aff'd*, 877 F.2d 44 (11th Cir. 1989),
  *rev'd on other grounds*, 500 U.S. 305, 111 S. Ct. 1833,
  114 L.Ed. 2d 350 (1991)...................................................................... 30-31

*Jones v. Cavazos,*
  889 F.2d 1043 (11th Cir. 1989) .................................................................. 26

*Jove Engineering, Inc. v. IRS,*
  92 F.3d 1539 (11th Cir. 1996) ............................................................... 24, 28

*Martinez v. Hutton (In re Harwell),*
  628 F.3d 1312 (11th Cir. 2010) .............................................................. 18, 21

*Meininger v. TMG Staffing Services, Inc. (In re Cypress Restaurant of Ga.),*
  332 B.R. 60 (Bankr. M.D. Fla. 2005) ............................................................ 22

*Miller Buckfire & Co. v. Citation Corp. (In re Citation Corp.),*
  493 F.3d 1313 (11th Cir. 2007) ................................................................. 13

*Moody v. Security Pacific Business Credit, Inc.,*
   971 F.2d 1056 (3d Cir. 1992) ........................................................ 32

*Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),*
   848 F.2d 1196 (11th Cir. 1988) ................................................ 19, 20, 25

*Official Comm. of Unsecured Creditors of Toy King Distributors, Inc. v.*
   *Liberty Savings Bank (In re Toy King Distributors, Inc.),*
   256 B.R. 1, 144 (Bankr. M.D. Fla. 2000) .................................... 22, 32

*Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re*
   *TOUSA, Inc.),*
   680 F.3d 1298 (11th Cir. 2012) ........................................... passim

*United States v. Moyer (In re Regency International Flooring, LLC),*
   No. 09-CV-1146, 2010 WL 4053982 (W.D. Mich. Oct. 14, 2010) ......... 12, 27-28

*United States v. Ruffs (In re Ryan),*
   98 F.3d 614 (11th Cir. 1996) ............................................... 26-27

*United States v. Ryan,*
   64 F.3d 1516 (11th Cir. 1995) ............................................. 27, 28

## Rules

Fed. R. App. P. 32 ...................................................................... 34

## Statutes

11 U.S.C. § 106 ........................................................................ 24

11 U.S.C. § 544(b) ...................................................................... 1

11 U.S.C. § 550 .................................................................. passim

26 C.F.R. § 01.6402-4 ................................................................. 27

26 C.F.R. § 301.6402-6T(b)(2) ........................................................ 27

26 U.S.C. § 6072(a) ................................................................... 26

26 U.S.C. § 6402 ................................................................. passim

26 U.S.C. § 6405 ................................................................ passim

26 U.S.C. § 6513(b)(2) .............................................................. 27

26 U.S.C. § 7401 ...................................................................... 25

28 U.S.C. § 158(a) .................................................................... vi

28 U.S.C. § 158(d) .................................................................... vi

28 U.S.C. § 1291 ....................................................................... vi

28 U.S.C. § 1334 ....................................................................... iv

Chapter 726 of the Florida Statutes ........................................ 2

## STATEMENT REGARDING ADOPTION OF BRIEFS
## OF OTHER PARTIES

The Appellant Deborah C. Menotte does not adopt any portion of any brief submitted by any other party.

## STATEMENT OF SUBJECT-MATTER AND
## APPELLATE JURISDICTION

The Appellant Deborah C. Menotte appeals the District Court's November 19, 2012 Order affirming in part and reversing in part the Bankruptcy Court's April 25, 2012 Findings of Fact and Conclusions of Law (R.E. #154) and the accompanying April 25, 2012 Final Judgment (R.E. #155) following a bench trial. (R.E. #15.)[1]   The District Court had jurisdiction over the appeal from the Bankruptcy Court pursuant to 28 U.S.C. §§ 158(a) and 1334.   This Court has jurisdiction over this appeal from the District Court under 28 U.S.C. §§ 158(d) and 1291.

---

[1]    "R.E. __" indicates a reference to the Record Excerpts.  The Record Excerpts are numbered to reflect their docket entry numbers with the lower courts. "D.E. __" indicates a reference to docket entries in Adversary Proceeding No. 10-03455 (Bankr. S.D. Fla.), if they are not in the Record Excerpts. "Ex. __" refers to the trial exhibits in the Adversary Proceeding.  "Tr. __" refers to the trial transcripts in the Adversary Proceeding.

## STATEMENT OF ISSUES

1.      Whether the District Court erred in holding that the Defendant the United States of America (the "United States") is a "mere conduit" rather than an "initial transferee" under 11 U.S.C. § 550(a) of the Bankruptcy Code, reversing the Bankruptcy Court's finding of fact to the contrary after a bench trial.

2.      Whether the District Court erred in holding that the Bankruptcy Court was correct in holding that the Debtor Custom Contractors, LLC (the "Debtor") was not operating with an unreasonable small capital under the Bankruptcy Code and the Florida Uniform Fraudulent Transfer Act in 2007 and the first two quarters of 2008.

## STATEMENT OF THE CASE

### A.    Course of Proceedings and Dispositions in the Courts Below.

On July 15, 2009, the Debtor filed a voluntary chapter 7 proceeding and the Trustee Deborah C. Menotte (the "Trustee") was thereafter duly appointed.  (R.E. #1 at p. 1, ¶¶ 1-2.)  On July 29, 2010, the Trustee brought an adversary proceeding against the United States to recover eight pre-petition transfers the Debtor made from its operating account directly to the Internal Revenue Service (the "IRS") that the Trustee claims were actually and constructively fraudulent under 11 U.S.C. § 548 of the Bankruptcy Code, and under 11 U.S.C. § 544(b) and Chapter 726 of the

1

Florida Statutes, the Florida Uniform Fraudulent Transfer Act. (D.E. #1.) The eight transfers were on account of the personal tax liabilities of the Debtor's principal, Brian Denson ("Denson"). (R.E. #154 at p. 2.)

After a bench trial, the Bankruptcy Court entered its Findings of Fact and Conclusions of Law, along with its Final Judgment. (R.E. #154, 155.) The Bankruptcy Court entered judgment in the Trustee's favor for $26,380.00, setting aside the eighth and final transfer based on its finding that the Debtor was insolvent at the time of that transfer under both the Bankruptcy Code and the Florida Uniform Fraudulent Transfer Act, and that the Trustee had proven all of the other elements for constructive fraud. (R.E. #154 at p. 15; R.E. #155.) The Bankruptcy Court also found that the Trustee proved all of the other elements of constructive fraud with respect to the first seven transfers, except that she failed to prove that the Debtor was operating with an unreasonable small capital under the Bankruptcy Code and the Florida Uniform Fraudulent Transfer Act when those transfers were made, so the Bankruptcy Court entered judgment in favor of the United States with respect to those transfers. (R.E. #154 at pp. 15-21; R.E. #155.)

The United States appealed to the District Court the Bankruptcy Court's finding of fact that the United States was not a "mere conduit" under applicable Eleventh Circuit law, and was accordingly liable as an "initial transferee" with respect to the eighth transfer under 11 U.S.C. § 550(a) of the Bankruptcy Code.

(D.E. #164, 177.)   The Trustee appealed to the District Court the Bankruptcy Court's finding of fact that the Debtor was not operating with an unreasonable small capital with respect to the first seven transfers. (D.E. #167, 181-182.) After consolidating the appeals, on November 19, 2012, the District Court entered its Order reversing in part and affirming in part the Bankruptcy Court.  (R.E. #15.) The District Court reversed the Bankruptcy Court's "mere conduit" finding, ruling that as a matter of law, the United States lacks dominion or control over estimated tax payments when the tax payer requests and receives a refund for an equal or greater sum the following year. (R.E. #15, pp. 10-17.)  The District Court affirmed the Bankruptcy Court's finding of no unreasonably small capital for transfers #1-7 as well supported by the record at trial.  (R.E. #15, pp. 4-10.)

## B.    Statement of the Facts

The facts presented at trial with respect to whether the United States was an "initial transferee" rather than a "mere conduit" under 11 U.S.C. § 550(a) of the

-3-

Bankruptcy Code were undisputed.  The following transfers were at issue:

| Transfer # | Amount | Date |
|------------|-----------|------------------|
| 1 | $73,801.00 | April 16, 2007 |
| 2 | $22,110.00 | April 16, 2007 |
| 3 | $22,110.00 | June 1, 2007 |
| 4 | $26,380.00 | April 1, 2008 |
| 5 | $2,644.00 | April 9, 2008 |
| 6 | $26,380.00 | June 3, 2008 |
| 7 | $151.25 | June 30, 2008 |
| 8 | $26,380.00 | September 15, 2008 |

(R.E. # 154 at p. 2.)

The Debtor made transfer #1 directly to the United States on account of income taxes that were at that time due and owing to the IRS by Denson.  (R.E. #154, p. 2, 5; Exs. 2.)    The Debtor made transfers #2-3 directly to the United States as estimated income tax payments on behalf of Denson personally during 2007.  (R.E. #154, p.2, 5; Exs. 3-4.)  Denson never sought any subsequent refund relating to these estimated payments the following year because transfers #2-3 were not sufficient to cover his whole personal tax liability for 2007.  (*Id.*)  The Debtor paid the difference between the estimated payments of transfer #2-3 and

-4-

what was due under his 2007 personal tax liabilities with transfers # 5 and 7. (*Id.*) The Debtor made transfers # 4, 6 and 8 directly to the United States as estimated income tax payments on behalf of Denson personally in 2008. (R.E. #154, p.2, 5, Exs. 7-9, 46.) Denson requested a refund in the spring of 2009 because he ultimately did not owe any taxes personally to the IRS for the 2008 tax year. (R.E. #154, p. 2, 5, Tr. 162:5 – 163:23, Exs. 7-9, 46.) Upon Denson's request, the United States paid him the sum of $116,740.00 directly as a refund, a sum greater than those in transfers #4, 6 and 8, on March 30, 2009. (*Id.*) After the Debtor made each of the transfers # 1-8, the United States deposited the sums into the Treasury and they were immediately spent on federal expenditures and comingled with general federal revenues. (R.E. #154, p. 26; Tr. 299:9 – 300:15.)

The facts presented at trial with respect to whether the Debtor was operating with an unreasonably small capital in 2007 and the first two quarters of 2008 were also undisputed. The Trustee's expert witness, Alan Barbee ("Barbee"), is a CPA and was accepted by the Bankruptcy Court without objection as an expert in "forensic accounting, insolvency, and adequate capital." (Tr. 9:10-16.) Barbee provided the opinion that the Debtor was operating with an unreasonably small capital in 2007 (covering transfers #1-3) and in the first two quarters of 2008 (covering transfers #4-7), after which the Debtor became insolvent (covering

-5-

transfer #8). (Tr. 19:25 – 20:7.) While his ultimate opinions were disputed, the evidence he relied upon was not disputed.

The Debtor was formed in 2006 with only $1,000.00 in capital, and began operating in 2007 as a general contractor in the commercial construction field. (Tr. 25:18-20; Tr. 38:11-15.)[2] The Debtor was a start-up venture, and while Denson had previously operated a residential construction company, the two industries are different. (Tr. 38:19 – 39:16.) The construction industry requires more capitalization than other industries. (Tr. 25:20-25.) Given the start-up nature of the Debtor, even more capital than normal would be needed than the usual commercial contractor. (Tr. 38:4-16.)

Also undisputed was the evidence that when the Debtor began operating in 2007, several leading economic indicators reflected a significant and rapidly-approaching downturn for the commercial construction industry, both locally and nationally. (Tr. 36:1 – 38:1; Ex. 47 at pp.6-8, 12-13, 16-17, 20-22.) This meant the Debtor needed even more capital than a normal construction company in early 2007 to survive the pending downturn. (Tr. 37:22 – 38:1.)

---

[2]    Denson testified the Debtor was capitalized with much more than $1,000.00, but no additional capitalization above the $1,000.00 was reflected in the Debtor's bank records, accounting records, or tax returns. (Tr. 217:21 – 218:4; Tr. 301:17 – 304:12; Tr. 311:24 – 314:11; Ex. 13.) The Bankruptcy Court accepted the Trustee's evidence of this $1,000.00 initial capitalization, but noted the conflicting evidence. (R.E. #154 at p. 16.)

The Debtor's financial records included "reviewed" financial statements as of June 30, 2007 (Ex. 16) and December 31, 2007 (Ex. 17). These "reviewed" financial statements showed, among other things, accrued profits for jobs with a negative cost of completion (projects booked at being more than 100% complete). (Tr. 28:25 – 29:23; Tr. 31:6-18.) For example, 11 of 33 jobs shown in the December 31, 2007 "reviewed" financial statement reflect a negative cost to complete. (*Id.*) Such a job status is impossible, and such "accounting" results in overstating revenue, which results in the overstating of working capital because working capital is based in large part on revenue. (Tr. 31:23-24.) Exhibits D and E of Exhibit 47 reflect the adjustments Barbee made, to the extent he could, to correct for revenue based on a negative cost of completion, which significantly reduced the booked profits of the Debtor for 2007 and 2008. Complete adjustments for jobs with a negative cost to complete were not possible given the absence of complete records and the expense involved. (Tr. 41:1-16.) Needless to say, this sort of accounting is inconsistent with GAAP. The United States challenged none of this evidence.

While Barbee was unable to adjust fully the working capital on the Debtor's books for the negative cost of the completion for jobs, he pointed out problems with the remaining booked profits from a capitalization viewpoint, testifying that most of what remained was not true working capital because it was illiquid, and

based on profits not yet realized.  (Tr. 32:19 – 33:14; Ex. 47 at Exhibit D.)  For example, a great deal of the Debtor's working capital was tied up in retainage, incomplete and long-term contracts, and was of low quality for this industry.  (Tr. 28:11-14; Tr. 88:6-18.)  This represented the "working capital" on the Debtor's books, but for these reasons should not be properly considered in a capitalization analysis. (Tr. 28:11-24.)  The United States challenged none of this evidence.

Barbee next compared the Debtor's solvency and liquidity ratios with those of similar-sized companies in the commercial construction industry for 2007 and the first two quarters of 2008.  (Ex. 47 at pp. 26-27.)  The Debtor's ratios were all lower than the industry for both 2007 and 2008, reflecting a more perilous financial situation than its peers.  (Ex. 47 at p. 27.)  In addition to the financial ratios, the Debtor's Z-Score, a predictor of a bankruptcy, was well below average for March of 2008 and June of 2008, average for December of 2007, and well above average for June of 2007.  (Ex. 47 at p. 27; Tr. 71:14 – 72:13.)

When the Debtor made transfer #7 on June 30, 2008, the Debtor had no bank debt. (Tr. 49:14 - 50:2.) By the date of the eighth and final transfer on September 15, 2008, the Debtor owed Washington Mutual $237,000.00 from a draw on a credit line.  (*Id.*)  Access to credit can help liquidity, but it does not help working capital. (Tr. 96:9-22.)  The United States challenged none of this evidence.

-8-

Denson testified that the Debtor was doing "great" after it was formed, but that it started "losing money" in late 2007. (Tr. 171:1-17.)   Denson based this testimony on the Debtor's tax returns for 2007, which reflected a profit, and on the Debtor's ability to pay its bills. (Tr. 170:16-25; Tr. 181:25 – 182:19; Tr. 186:10-17.) Denson tried to maintain three to four months of cash to make its payroll and other expenses. (Tr. 182:20 – 183:3.)   The Debtor financed its operations in part from paying vendors late, however. (Tr. 310:18-25.)  With respect to transfer #8 made on September 15, 2008, Barbee testified that in his opinion, the Debtor was insolvent at this time based on the assets and property of the Debtor being less than its debts and liabilities, and the continued loss of money and erosion of earnings that had begun in 2007. (Tr. 48: 7 – 49:13; Ex. 47 at p. 31.)

After trial, the Bankruptcy Court ruled that the United States was not a "mere conduit" with respect to the estimated tax payments the Debtor made on Denson's behalf, notwithstanding the fact that Denson subsequently requested the United States to issue a tax refund to him in greater sums, which the United States issued to him. (R.E. #154 at p. 26.) Taking into consideration the evidence at trial, the pertinent "mere conduit" case law set forth by this Court, and the tax refund statutes of 26 U.S.C. §§ 6402 and 6405, the Bankruptcy Court found as a matter of fact that the United States exercised dominion and control over the estimated tax payments at issue, and therefore is liable to the Trustee as an "initial transferee"

-9-

under § 550(a) for the receipt of the fraudulent transfers from the Debtor.  (R.E.
#154, pp. 21-27.)

    As for recovery of the transfers, the Bankruptcy Court first addressed the
solvency of the Debtor for the third quarter of 2008 (transfer # 8).  (R.E. #154 at p.
13.)  The Bankruptcy Court found the Debtor was insolvent because its assets fell
below its liabilities.  (R.E. #154 at pp. 13-15.)  This was the extent of the
Bankruptcy Court's analysis, and was not challenged on appeal to the District
Court by the United States or to this Court.

    With respect to capital adequacy for transfers #1-7, the Bankruptcy Court
found that the Debtor was not operating with an unreasonably small capital in 2007
and the first two quarters of 2008.  (R.E. #154 at p. 21.)  The Bankruptcy Court
noted that after Barbee "making hundreds of thousands of dollars" of adjustments
to the Debtor's "reviewed" financial statements, based on the jobs booked with a
negative cost of completion, the Debtor still had significant working capital
reflected on its books.    (R.E. #154 at p. 15.)    This was the extent of the
Bankruptcy Court's finding for 2007.

    For the first two quarters of 2008, the Bankruptcy Court noted it was a
"closer question[,]" but found that the Debtor was sufficiently capitalized for 2007
due to the working capital remaining on its adjusted financial statements as
submitted by Barbee for the end of that year to carry on into the next, and after

-10-

Barbee's same adjustments to the 2008 "reviewed" financial statements, enough working capital remained on the books. (R.E. #154 at p. 16.) The Bankruptcy Court found Barbee's reliance on ratios faulty, that some of the Z-Scores were within a normal range for 2007, and that the revenues for the companies in his model low ranged at $10 million and the Debtor's were $8.4 and $8.2 million and that the ratios were thus not useful. (R.E. #154 at pp. 18-19.)    Noting that the Debtor kept sufficient cash to fund payroll and operations for three to four months and did not incur any bank debt until after June 30, 2008, the Bankruptcy Court concluded that the Debtor was not operating with an unreasonably small capital at any time prior to June 30, 2008. (R.E. #154 at p. 20.)

In its analysis, the Bankruptcy Court considered the undisputed evidence of the Debtor's $1,000.00 initial capitalization, the related evidence of its formation, industry performance and forecasts during the 2007-2008 timeframe, and the leading economic indicators, as wholly "irrelevant," however. (R.E. #154 at p. 17.) The Bankruptcy Court acknowledged the Trustee's unrefuted evidence of the poor quality of the Debtor's working capital, and the deteriorating housing market present even upon its formation, but relying on the Seventh Circuit for the proposition that the concept of inadequate capital was "fuzzy," the Bankruptcy Court stated that the concept of inadequate capital presents a danger of being interpreted with "hindsight bias" and that it must resist supposing that because a

-11-

company ultimately failed that it must have been inadequately capitalized. (R.E. #154 at pp. 17-18.) (citing *Boyer v. Crown Stock Distr., Inc.*, 587 F.3d 787, 794 (7th Cir. 2009)). The Bankruptcy Court added:

> To the extent that Mr. Barbee's opinion is based upon the need for additional capital because of the risk of being in the construction industry in the middle of a downturn, it appears to suffer from the influence of hindsight bias.

(R.E. #154 at p. 18.)

On appeal, the District Court affirmed the Bankruptcy Court's finding of fact that the Debtor was not operating with an unreasonable small capital in 2007 and the first two quarters of 2008 as "well supported by the record." (R.E. #15, p. 10.) Turning to the United States' appeal of the Bankruptcy Court's finding of fact that the United States is not a "mere conduit," the District Court found erroneous the Bankruptcy Court's "strictly construing Eleventh Circuit precedent," and ruled that as a matter of law, the United States is a "mere conduit" for sums it receives as estimated tax payments when it subsequently issues a refund in the same or greater amount, relying on *United States v. Moyer (In re Regency International Flooring, LLC)*, No. 09-CV-1146, 2010 WL 4053982 (W.D. Mich. Oct. 14, 2010). (R.E. #15, p. 12.) The District Court found "inequitable" the result that United States would have to disgorge an estimated tax payment when it had subsequently issued a refund. (R.E. #15, p. 16.)

-12-

## C.    Standard of Review

This Court reviews the Bankruptcy Court's and District Court's rulings on questions of law *de novo*, and reviews the Bankruptcy Court's findings of fact for clear error. *Miller Buckfire & Co. v. Citation Corp. (In re Citation Corp.)*, 493 F.3d 1313, 1317 (11th Cir. 2007). As the second Court to review a judgment of a bankruptcy court, this Court reviews the Bankruptcy Court's order independently of the District Court. *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1310 (11th Cir. 2012).

-13-

## SUMMARY OF THE ARGUMENT

This Court has developed a dominion and control test for determining whether the recipient of funds from a debtor is an "initial transferee" and accordingly liable as such to a bankruptcy trustee under 11 U.S.C. § 550(a), or a "mere conduit" which is not liable. While this inquiry is an equitable test, it inquires as to whether the recipient exercised dominion and control over the funds received from a debtor. Here, it was undisputed at trial that the United States received the estimated tax payment in transfer #8 in September of 2008 from the Debtor, and spent that transfer immediately on federal expenditures after depositing it into the Treasury with funds received from millions of others. The United States immediately spent this money and it was gone. Neither Denson nor the Debtor had any say in how it was spent or any rights over it after its payment whatsoever. It was not until March of the following year when Denson requested a refund did the United States pay him a sum exceeding the amount of transfer #8. In the interim, neither the Debtor nor Denson had any rights, to payment or otherwise, in transfer #8.

While § 6405(a) of the Internal Revenue Code required the United States to issue a refund to Denson under certain circumstances the following year if certain set-off rights in favor of the United States did not exist under § 6402, the United States' obligation to issue a refund does not retroactively change or alter the United

-14-

States' exclusive dominion and control over transfer #8 when it was received, under the undisputed facts of this case, the Internal Revenue Code, and applicable case law. The dominion and control test is equitable in nature, but it is not a catch-all escape-hatch for any recipient which thinks it is unfair to have to pay sums back to a bankruptcy trustee.

With respect to capital adequacy, the Bankruptcy Court ruled that the Trustee failed to prove her case and found unconvincing much of her evidence based on the Debtor's post-formation operations.    However, the crux of the Trustee's capital inadequacy case was based on evidence surrounding the Debtor's formation and the economic conditions present at the time in that industry.    The United States challenged none of it.  The Bankruptcy Court wholesale wrote off all of this evidence as "irrelevant" as reflecting "hindsight bias," relying on the Seventh Circuit.  With respect to this type of evidence, this Court has recently ruled that such industry evidence is highly relevant to a capital adequacy inquiry. The Trustee's evidence on this point was not given its due by the Bankruptcy Court, and that omission is contrary to this Court's recent holding and is clearly erroneous.

-15-

## ARGUMENT

**A.    The United States Is Not a "Mere Conduit" under § 550(a).**

To the extent the Bankruptcy Court's finding that the United States is not a "mere conduit" and is accordingly liable as an "initial transferee" was based on the facts presented at trial concerning the United States' dominion and control over transfer #8, the District Court did not find, and the United States has not argued, that the Bankruptcy Court's findings were clearly erroneous.    Indeed, the Bankruptcy Court did not find that the United States can never qualify for the "mere conduit" defense.    Rather, the Bankruptcy Court found on the undisputed facts in this case with respect to transfer #8 that the United States received transfer #8, deposited it into the Treasury, and spent those funds immediately.    The Bankruptcy Court found this action reflected dominion and control over those funds under Eleventh Circuit law sufficient to take the United States out of the "mere conduit" exception to § 550(a).

The Bankruptcy Court also found as a matter of fact that while the United States has an obligation to refund estimated tax payments under the circumstances set forth in § 6405, this does not take away from the dominion and control exercised by the United States over those payments upon receipt, especially in light of the United States' additional rights over a subsequent refund under § 6402. Considered as it should be as a finding of fact, no clear error can possible be found,

and this Court should affirm the Bankruptcy Court's finding of no "mere conduit" in this case. *See In re TOUSA*, 680 F.3d at 1310-11.

To the extent the Bankruptcy Court's decision with respect to "mere conduit" can be considered an issue of law, which is how the District Court considered it, under a *de novo* review, the Bankruptcy Court's holding should be affirmed as well. The undisputed evidence at trial and the pertinent Internal Revenue Code provisions reflect that the United States receives estimated tax payments and immediately deposits them into the Treasury, at which time they are spent on federal expenditures over which the payor has no say or control. From the time of the estimated payments through any request for a refund the following year, neither the payor nor the tax payer (in this case, they were not the same) has any say or control whatsoever over how those funds are spent by the United States, any right to recover or receive them back, and has no right in them at all. *Only* if the tax payer owes less in federal income tax after the year ends against what that tax payer paid that year in estimates, is that tax payer entitled to *request* a refund from the United States under § 6405. And even then, the United States is required to issue a refund only in the absence of various set off rights it statutorily possesses under § 6402.

-17-

To contend that the United States is a "mere conduit" over estimated payments because it lacks sufficient dominion and control over them is simply preposterous. Such a contention based on the undisputed facts here flies in the face of this Court's body of law setting forth the dominion and control test as proscribed under 11 U.S.C. § 550(a) and is completely untenable.

Section 550(a) of the Bankruptcy Code proscribes that the "initial transferee" of an avoidable transfer, such as a fraudulent transfer, is liable to a bankruptcy trustee for the value of that transfer. No good faith or lack of knowledge defense is available to an initial transferee; an initial transferee is strictly liable to a trustee if the trustee can meet her burden under the applicable avoidance statutes, such as § 548 which makes fraudulent transfers avoidable. *See* 11 U.S.C. § 550(b). The Bankruptcy Code does not define "initial transferee," and no legislative history exists for the term. *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1317 (11th Cir. 2010). Over the years and in a series of cases, this Court has addressed the term "initial transferee" and carved out an equitable exception to the strict liability imposed by § 550(a) if that "initial transferee" lacks sufficient dominion and control over the funds transferred such that the imposition of liability would be unfair. *See id.*

In *Chase & Sanborn*, this Court held that the debtor was not an initial transferee of funds placed into one of its re-opened bank accounts because

-18-

although the debtor has "possession" of the funds, it "did not have sufficient control over the funds to warrant a finding that the funds were the debtor corporation's property." 813 F.2d 1177 (11th Cir. 1987). This Court reasoned that the debtor never controlled the funds in its account because the source of the money was its owner's personal loan from another bank, the funds were used to pay a personal debt of that owner/borrower, the funds were only in the debtor's account for two days, the account was opened immediately before the deposit and closed immediately after the withdrawal, the debtor's management was unaware of the existence of this account or the deposit, and the account was opened under a former name of the debtor. *Id.* at 1182. This Court concluded that the debtor did not control the money or the transfer, and it was therefore not an "initial transferee" under § 550(a) so as to be liable to a bankruptcy trustee. *Id.*

Next, this Court considered the term "initial transferee" again in *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, where it adopted a control test to determine whether an initial transferee had possession of a transfer which requires "courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." 848 F.2d 1196, 1199 (11th Cir. 1988). There, this Court stated that it refused to allow trustees to recover property from defendants as "initial transferees" who simply held the property or money as agents or conduits for one of the real parties to the transaction. *Id.* at 1199-1200.

-19-

Ultimately, this Court held that a bank which had simply received funds into an account and then wired them out at the account holder's legal request was a conduit because the bank lacked any control over the funds, and acted at the direction of the account holder at all times, as it was legally obligated to do. *Id.* at 1200. This Court noted that this situation is different than if a bank received money on account of a loan, where a debtor/creditor relationship exists between the bank and the transferor of the funds in question, and the bank uses the funds received as its own and for its own purposes. *Id.* at 1201-02. Such is the precise case here.

Finally, in *Andreini & Co. v. Pony Express Delivery Services, Inc. (In re Pony Express)*, this Court held that initial transferees are not conduits "if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee." 440 F.3d 1296 (11th Cir. 2006). This Court noted that "[t]his [control] test takes on special significance where the recipients of avoidable transfers are agents or fiduciaries of the debtor-transferor, such as banks or, in this case, insurance brokers, who are duty-bound to take only limited actions with respect to the funds received." *Id.* at 1300-01. "Often these fiduciaries or agents are not considered initial transferees because their legal control over the assets

-20-

received is circumscribed by their legal duties to their clients." *Id.* at 1301. Ultimately, this Court determined that the insurance brokerage company had no legal control over a wire transfer, was a mere conduit for premium payments, and "no genuine debt was created" between the insurance company and the transferor. *Id.* at 1303-04.

Most recently, the Eleventh Circuit analyzed these cases in detail and stated that "[e]quitable considerations play a major role in the mere conduit or control test because it would be inequitable to hold an initial recipient of the debtor's fraudulently-transferred funds liable where the recipient could not ascertain the transferor debtor's solvency, lacked any control over the funds, or lacked knowledge of the source of the funds." *Harwell*, 628 F.3d at 1322. This Court held that "initial recipients of the debtor's fraudulently-transferred funds who seek to take advantage of the equitable exception to §550(a)(1)'s statutory language must establish (1) that they did not have control over the assets received, i.e. that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent scheme." *Id.* at 1323 (emphasis in original). The *Harwell* case added a good faith requirement to claim the "mere conduit" defense; it did not step back from the dominion and control test previously developed by this Court. *Harwell* left the dominion and control test intact, but added a good

-21-

faith requirement.

Other courts within the Eleventh Circuit have noted the conduit exception exists to prevent liability against "mere stakeholders, bailees, and intermediaries to liability, where they have never stood to gain personally from the funds momentarily in their possession." *Official Comm. of Unsecured Creditors of Toy King Distributors, Inc. v. Liberty Savings Bank (In re Toy King Distributors, Inc.)*, 256 B.R. 1, 144 (Bankr. M.D. Fla. 2000) ("Generally, 'mere conduits' hold transferred funds via escrow, trust, or deposit, and do so only in the status of commercial or professional intermediaries to the parties that actually hold or receive a legal right, title, or interest."); *accord Meininger v. TMG Staffing Services, Inc. (In re Cypress Restaurants of Ga., Inc.)*, 332 B.R. 60, 63-64 (Bankr. M.D. Fla. 2005) (conduit status generally for escrow agents, banks, and those with no interest in the funds with no discretion to use, and funds segregated).

Under this Court's dominion and control test, the United States is in no way, shape, or form a "mere conduit," under the facts of this case. The United States received transfer #8, and immediately deposited it into the Treasury at which time it was used to fund government expenditures with no input in, say over, direction of, or control by the Debtor or Denson. The United States spent transfer #8 immediately in its sole and absolute discretion for its own purposes, and those funds were gone. The United States did not hold transfer #8 in escrow or in a

-22-

segregated account pending a potential refund request the following year. The funds were not held at all for any period of time. The United States owed no duty to the Debtor or Denson, relating to these funds or anything else. The United States does not received estimated tax payments as a fiduciary to the tax payer or payor. Estimated tax payments do not sit "on deposit" with the United States pending direction of the tax payer or payor, and are not segregated or treated differently than any other funds being deposited into the Treasury from any source. And unlike many of the Eleventh Circuit cases, the transfers to and from the purported conduit here were not temporally close so as to suggest lack of control by the recipient. The United States received transfer #8 from the Debtor on September 15, 2008 and refunded a greater amount on March 30, 2009, over six months later. The United States oddly claims no dominion or control over funds it received from one party when it paid the refund to someone else six months later. These undisputed facts at trial take the United States far outside the "mere conduit" exception set down by this Court. Any other result on these facts effectively overrules every previous Eleventh Circuit case on the issue. The United States' remedy is a Congressional amendment, not a distortion and perversion of a long line of Eleventh Circuit precedent.

This Court's dominion and control test cannot be waived, disregarded, or relaxed to the point of absurdity because the United States, or the District Court,

-23-

believe that it is unfair or inequitable for the United States to have to disgorge to a

bankruptcy trustee funds it received from a debtor when like or greater funds were

subsequently refunded to the debtor's principal. While the conduit exception is

based in equity, it only affords those persons and entities which this Court has held

lack sufficient dominion and control over the funds to be liable to a bankruptcy

trustee in all fairness. While the United States may later owe less, the same, or

greater sums to the tax payer statutorily under § 6405(a), this creates nothing more

than a debtor/creditor relationship between the payor and the United States, which

this Court has held does *not* make the recipient a conduit. *See Nordberg*, 848 F.2d

at 1201-02.[3] The United States and taxpayers litigate rights to refunds every day

---

[3]    And while the United States claims the result here was unfair, the United States received funds from an entity that did not owe the United States any funds and which was insolvent, both of which the Bankruptcy Court found as a matter of fact and which is not challenged. Under § 550(a), the United States must pay those funds back to be distributed to legitimate creditors of the party who paid them under these circumstances regardless of any good faith or lack of knowledge. This is the purpose of the Bankruptcy Code. *See In re TOUSA*, 680 F.3d at 1311. And the United States has a remedy against Denson after disgorgement to the Trustee to declare the taxes unpaid and initiate an action against Denson if he refuses to pay. *See* 26 U.S.C. § 7401 *et seq*. The legal fiction the United States spun to the District Court of having to "pay twice" ignores its rights against Denson under the Internal Revenue Code and has nothing to do with the dominion and control test that is the pertinent inquiry. Again, the "mere conduit" exception is not a catch-all escape hatch for an unhappy initial transferee. Moreover, the Bankruptcy Reform Act of 1994 amended 11 U.S.C. § 106 to abrogate sovereign immunity for, among other sections of the Bankruptcy Code, §§ 544 and 548. Pub. L. No. 103-394, 108 Stat. 4106 (1994). This waiver with respect to recovering transfers against the United States is unequivocal. *Jove Engineering, Inc. v. IRS*, 92 F.3d 1539, 1542

-24-

under § 6405(a); that section is not self-executing with funds automatically being repaid upon a claimed overpayment and no property right exists in them until payment.    A debtor/creditor relationship that is created under § 6405(a) the following year does not retroactively strip the United States of the absolute dominion and control it exercised over the estimated tax payment upon receipt. From the example provided at trial, a battle tank purchased with the estimated tax payment that was comingled with millions of others is not subsequently returned to the tank manufacturer because the battle tank was paid for with funds which turned out to somehow have never belonged to the United States, as is the logic and argument of the United States and the District Court. All § 6405(a) does is create a debt owed to the taxpayer by the United States, the following year, and only under certain circumstances.    It does not create a conduit relationship.

In fact, between the time when the estimated tax payment is made and the following year when a refund for an overpayment is sought, the payor has no right in the funds, to recover the funds, or has any say in their use until its entitlement to a refund matures the following tax year.  *See Henkel v. United States (In re Carpenter)*, 367 B.R. 850, 857 (Bankr. M.D. Fla. 2006) (a taxpayer who overpays in quarterly estimated payments is not entitled to receive those monies back until

---

(11th Cir. 1996).  The United States' claim that it has unfairly been inadvertently and unintentionally "tossed to the wolves" under § 550(a) is belied by Congress' 1994 amendments.

-25-

the conclusion of the tax year, and cannot seek a refund in the interim) (citing 26 U.S.C. §§ 6513(b)(2), 6072(a)); *see also In re Pigott*, 330 B.R. 797, 802 (Bankr. S.D. Ala. 2005) ("This court concludes that 26 U.S.C. § 6402(a) precludes the 2004 tax overpayment of the Pigotts from being part of the bankruptcy estate until the Secretary of the Treasury releases it to them as a refund.")

And the United States has rights against a tax refund, under § 6402, which further reflects its dominion and control over estimated payments. Section 6402 sets forth a host of rights the United States has against over overpayments to satisfy other federal obligations before any right to receive any refund exists. The United States can use such funds to offset any other Federal debt of its sole choosing. *United States v. Ruff (In re Rush-Hampton Industries, Inc.)*, 98 F.3d 614, 615 (11th Cir. 1996) (the United States can off-set overpayments or refunds from one year against sums owed from another year); *United States v. Ryan (In re Ryan)*, 64 F.3d 1516, 1523 (11th Cir. 1995) (the United States has such freedom to use overpayments that if multiple years of liability exist, the United States may choose which year to credit with the future refund, regardless of the debtor's request that the overpayment be applied to another year) (citing 26 C.F.R. §301.6402-1)); *Jones v. Cavazos*, 889 F.2d 1043, 1047-48 (11th Cir. 1989) (United States may use overpayment for payment of delinquent student loans or any other Federal debt (citing 26 C.F.R. § 301.6402-6T(b)(2)); *Crawford v. Department of*

-26-

*Treasury (In re Crawford)*, 2001 WL 1136919 (Bankr. W.D. Wis., Case No. 00-34046-13, July 23, 2001) ("[S]ection 6402(a) leaves to the Commissioner's discretion whether to apply overpayments to delinquencies or to refund them to the taxpayer."); *accord Ewing v. United States (In re Ewing)*, 400 B.R. 913, 916 (Bankr. N.D. Ga. 2008).   The United States can exercise its rights before any tax return reflecting the right to a refund or overpayment is even filed.  *In re Ryan*, 64 F.3d at 1523 (citing 26 C.F.R. § 01.6402-4).   The taxpayer has no say how the money is used in the meantime.  *Id.* (citing 26 C.F.R. § 301.6402-3(a)(5)).

In sum, nothing about §§ 6402 or 6405, or related case law, retroactively strips the United States of the dominion and control it exercises over estimated tax payments.  If anything, the United States' dominion and control is underscored by this inquiry.   The United States, and the District Court, rely upon *Regency International Flooring, LLC*, 2010 WL 4053982, for the proposition that the United States is a "mere conduit" for estimated tax payments where a refund is subsequently made.  There, a district court reversed the bankruptcy court's setting aside of a fraudulent transfer.  This case is both distinguishable from, and wholly inconsistent with, the Court's conduit law on the issue.  First, the payment at issue in *Moyer* was sent by the Debtor/LLC to the IRS for the exact sum for which the tax payer, a co-owner of the LLC, would be liable on account of the income of the LLC as a pass-through tax entity.  2010 WL 4053982, *1.  The individual co-

-27-

owner later received a partial refund on account of other losses on his return. *Id.*
While the Debtor in the instant case was a pass-through entity as well, transfer #8
was not a sum that Denson owed as the owner on account of the Debtor's profits
that were attributable to him. Transfer #8 was instead an estimated sum for both
Denson and his wife for their entire tax liability for 2008, and were completely
refunded to Denson because the Debtor operated at a loss that year. Not relying
upon any case law, the district court in *Moyer* simply held that the United States
could not be liable because "[t]he Court is confident that Congress did not intend
to require the IRS to disgorge the amount of the payment twice, i.e. once to the
taxpayer as a refund, and once to the Trustee under §550(a)(1)." That court cites
no authority to support this finding of purported Congressional intent. Such a
finding runs contrary to the well-settled purpose of §550(a)(1) to restore the estate
to the financial condition it would have enjoyed had the transfer had not occurred,
*see In re TOUSA*, 680 F.3d at 1311, and Congress' absolute waiver of sovereign
immunity for the recovery of fraudulent transfers under both federal and state law
under the Bankruptcy Code, *see Jove Engineering, Inc.*, 92 F.3at 1542. The
Michigan district court's finding that the United States never had control over
funds that are paid and ultimately refunded runs contrary to the facts shown in this
case that the United States spent these funds immediately upon receipt and in its
sole discretion. The *Moyer* holding is based on a finding of what that court

-28-

contends "must have been" Congress' intent (despite Congress' unequivocal waiver of sovereign immunity in the 1994 amendments), and is not based on the dominion and control factors this Court has ruled are the proper inquiry. And its analysis and conclusions do not square with the facts adduced at the trial in this matter. This case is directly contrary to this Court's precedent and the facts of this case and should have no bearing in this case, much less a dispositive one as held by the District Court.

### B.   Economic Conditions in 2007 and the Facts Surrounding the Debtor's Formation are not "Irrelevant" as "Hindsight Bias."

The facts supporting the Trustee's claim that the Debtor was operating with an unreasonably small capital in 2007 and for the first two quarters of 2008 are not in dispute. The Bankruptcy Court rejected the Trustee's evidence of industry ratios and the Z-Scores which evaluated post-formation operations of the Debtor. The Bankruptcy Court found that even the adjustments made by Barbee to the Debtor's reviewed financial statements for 2007 and the first two quarters of 2008 reflected what it found to be substantial working capital, even though Barbee had explained the many problems with these remaining numbers.

However, the Debtor operated for approximately two years only, and its records posed a host of reliability problems that were pointed out at trial. While the post-formation evidence adduced by the Trustee was rejected by the

Bankruptcy Court, the Trustee's capital inadequacy case rested heavily, and almost exclusively, on the start-up nature of the Debtor in a capital intensive industry in which it was a start-up player, as well as the significant and foreseeable economic downturn this industry was facing in 2007 that would require even more initial capital than a usual start-up company in this industry in normal economic times. Against all of these undisputed facts, the Debtor was capitalized with only $1,000.00.

The Bankruptcy Court's wholesale rejection of the Trustee's formation and industry evidence as "irrelevant" and improperly reflecting "hindsight bias" based on the Seventh Circuit's *Boyer* holding cost the Trustee her case to recover transfers #1-7 for the benefit of creditors of the Debtor's estate. This was not because the Bankruptcy Court found the formation and industry evidence not credible or insufficient, but "irrelevant." Writing off this evidence as "irrelevant" was an error of law under this Court's precedent. For this Court to reverse the Bankruptcy Court's ruling on capital inadequacy on this point does not require it to make independent factual findings or substitute its versions of the facts over the Bankruptcy Court's. Rather, for this Court to reverse, all it needs to find is that the Bankruptcy Court erred in the legal significance of the undisputed facts presented to it. *See In re Owen*, 86 B.R. 691, 693 (Bankr. M.D. Fla. 1988), *aff'd*, 877 F.2d

44 (11th Cir. 1989), *rev'd on other grounds*, 500 U.S. 305, 111 S. Ct. 1833, 114 L.Ed. 2d 350 (1991).

Shortly after the Bankruptcy Court's decision, this Court ruled precisely to the contrary with respect to the legal significance of such evidence in *TOUSA*, which upheld a bankruptcy court's finding of inadequate capitalization in part due to evidence surrounding the construction industry in 2007 as reflecting not "a once in a century credit tsunami" incapable of being predicted or foreseen, but rather a "slow-moving category 5 hurricane" that was perfectly foreseeable and that formed the basis to set aside those transfers. 680 F.3d at 1312. While *TOUSA* involved over $500 million in transfers and a 13-day bench trial, the ruling equally applies in this case. If the construction industry's sharp decline is properly the basis for finding lack of adequate capital in *TOUSA* as completely foreseeable, that same industry evidence cannot be wholesale written off as "irrelevant" and reflecting "hindsight bias" in this case simply because less money was involved and the trial was shorter. There can be no other distinction between these two cases. The industry evidence adduced during both made the same points. The Bankruptcy Court's reliance on the Seventh Circuit's *Boyer* decision is erroneous given this Court's subsequent ruling in *TOUSA*. Given the materiality of this evidence to the Trustee's case, this error was in no way harmless. The Bankruptcy Court's

reliance on *Boyer* gutted the Trustee's case on capital inadequacy for transfers #1-7.

Underscoring the gravity of this error and its effect on these proceedings, the Bankruptcy Court ruled that the Debtor was insolvent in the third quarter of 2008, when the Debtor made transfer #8 for $26,180.00 on September 15, 2008. Yet at the same time, the Bankruptcy Court ruled that the Debtor was not operating with an unreasonably small capital as late as June 30, 2008, when it made transfer #7 for $26,180.00. Only seventy-five days passed between transfer #7 and transfer #8. Operating with an unreasonably small capital is a precursor to insolvency. *See Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1075 (3d Cir. 1992); *In re Toy King*, 256 B.R. at 142. By ignoring the industry and formation evidence as "irrelevant" and reflecting "hindsight bias," the Bankruptcy Court made a ruling that is not justifiable on this record and these facts. All that changed financially with the Debtor between June 30, 2008 and September 15, 2008 is the Debtor drew $237,000.00 against a credit line. The Bankruptcy Court does not explain, nor can it be explained under its reasoning, how drawing $237,000.00 against a credit line when the Debtor has working capital as of June 30, 2008 of $266,323.00 (after adjustments by Barbee to correct for jobs with a negative costs to complete) renders the Debtor insolvent without it having operated without an unreasonable small capital prior to the preceding 75 days. Transfers #7-8 are for

-32-

modest sums, yet the Bankruptcy Court's decision states that the Debtor could not withstand the second payment and remain solvent. If the Debtor was operating so perilously close to the ground on September 30, 2008 that it cannot withstand a $26,180.00 payment and remain solvent, it necessarily was operating with an unreasonably small capital 75 days beforehand. The Bankruptcy Court's wholesale writing off of the host of the Trustee's evidence produced this anomalous finding. The Bankruptcy Court's admission that the concept of inadequate capital is "fuzzy" only underscores this error.

## CONCLUSION

The Bankruptcy Court properly applied Eleventh Circuit law on dominion and control to find that the United States is not a "mere conduit" in this case, and is liable as an "initial transferee" under 11 U.S.C. § 550 based on the facts presented at trial. The Trustee asks this Court to affirm this finding as factually correct based on the evidence produced, and correct as a matter of law. As for capital inadequacy, the Bankruptcy Court made an error of law by deeming irrelevant the undisputed basis for the Trustee's claim surrounding the Debtor's formation and the construction industry in 2007. This Court should reverse the Bankruptcy Court's finding that the Debtor was not operating with an unreasonably small capital in 2007 and the first two quarters of 2008, and remand for reconsideration of this evidence under the proper legal standard.

-33-

## **CERTIFICATE OF COMPLIANCE UNDER F.R.A.P. 32(A)(7)**

Undersigned counsel, G. Steven Fender, Esq., certifies that the Trustee's Initial Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,796 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14.

GREENSPOON MARDER, P.A.

MICHAEL R. BAKST, ESQ.
Florida Bar No.: 866377
G. STEVEN FENDER, ESQ.
Florida Bar No.: 060992
Attorney for Appellant Trustee
Deborah C. Menotte
250 S. Australian Ave., Suite 700
West Palm Beach FL 33401
Telephone: (561) 838-4509
Facsimile: (561) 514-3409

-34-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that two true and correct copies of the foregoing was furnished to the parties set forth below in the manner indicated on this the 6th day of February 2013.

**By regular U.S. Mail to:**
Rachel I. Wollitzer, Esq.
US Dept. of Justice, Tax Division, Appellate Section
P.O. Box 502
Washington, DC 20044

Kenneth W. Rosenberg
US Dept. of Justice, Tax Division
P.O. Box 502
Washington, DC 20044

GREENSPOON MARDER, P.A.

MICHAEL R. BAKST, ESQ.
Florida Bar No.: 866377
G. STEVEN FENDER, ESQ.
Florida Bar No.: 060992
Attorney for Appellant Trustee
Deborah C. Menotte
250 S. Australian Ave., Suite 700
West Palm Beach FL 33401
Telephone: (561) 838-4509
Facsimile: (561) 514-3409

-35-