# No. 12-16489

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

DEBORAH C. MENOTTE,

Plaintiff - Appellant

v.

UNITED STATES OF AMERICA,

Defendant - Appellee

ON APPEAL FROM THE DECISION OF THE
UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

BRIEF FOR THE APPELLEE

KATHRYN KENEALLY
*Assistant Attorney General*

THOMAS J. CLARK        (202) 514-9084
KENNETH W. ROSENBERG   (202) 514-1919
*Attorneys*
*Of Counsel*:                  *Tax Division*
                              *Department of Justice*
WILFREDO A. FERRER    *Post Office Box 502*
  *United States Attorney*    *Washington, D.C. 20044*

## CERTIFICATE OF INTERESTED PERSONS

No. 12-16489: *Menotte v. United States*

Pursuant to Rule 26.1 1 of this Court, it is hereby certified that the following persons and entities have an interest in the outcome of this case or have participated as attorneys or as judges in the adjudication of this case:

Bakst, Michael, Attorney for Deborah C. Menotte

Clark, Thomas J., Attorney, Tax Division, Department of Justice

Carnahan, Rilyn A., Attorney for Deborah C. Menotte

Custom Contractors, LLC, Debtor

Denson, Brian, sole member of Debtor

Doyle, Philip, Attorney, Tax Division, Department of Justice

Fender, G. Steven, Attorney for Deborah C. Menotte

Greenspoon Marder, P.A., Attorneys for Deborah C. Menotte

Hyman, Paul G., Judge, Bankruptcy Court for the Southern District of Florida

Keneally, Kathryn, Assistant Attorney General, Tax Division, Department of Justice

Menotte, Deborah A., Trustee

9152933.1

Page C-2 of 2

No. 12-16489: *Menotte v. United States*

Moore, K. Michael , Judge, District Court for the Southern

District of Florida

Rosenberg, Kenneth W., Attorney, Tax Division, Department of

Justice

- i -

## STATEMENT REGARDING ORAL ARGUMENT

We believe that oral argument would be helpful in this case due to the complexity of the issues presented.

- ii -

# TABLE OF CONTENTS

**Page(s)**

Certificate of interested persons.................................. C-1

Statement regarding oral argument.............................. i

Statement of jurisdiction..................................... xiii

Statement of the issues........................................ 1

Statement of the case........................................ 2

    A.    Course of proceedings and disposition in

        the courts below................................. 2

    B.    Statement of facts................................. 4

        1.    The debtor's prepetition tax payments............. 4

        2.    The debtor's business operations.................. 6

        3.    The adversary proceeding........................ 7

        4.    The bankruptcy court's decision.................. 9

        5.    The District Court's decision.................... 14

    C.    Statement of the standard or scope of review........... 18

Summary of argument........................................ 19

- iii -

**Page(s)**

Argument:

I.    The inclusion of § 544 in the list of Bankruptcy Code provisions in respect to which sovereign immunity is abrogated does not override the specific requirement in § 544(b)(1) that a transfer be "voidable under applicable law by a creditor holding an unsecured claim". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.    The first seven tax payments made by the debtor were not constructively fraudulent, because the debtor was not operating with "unreasonably small capital" when the payments were made. . . . . . . . . . . . . . . . 41

    A.    Introduction

    B.    The debtor did not have "unreasonably small capital". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

III.    The final payment made by the debtor is not recoverable by the Trustee because the Internal Revenue Service was a "mere conduit". . . . . . . . . . . . . . . . 53

    A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

- iv -

**Page(s)**

B.     The Trustee cannot recover the eighth

payment because the IRS was a "mere conduit"..... 56

Conclusion............................................... 65

Certificate of compliance................................. 66

Certificate of service.................................... 67

Addendum.............................................. 68

9152933.1

- v -

# TABLE OF AUTHORITIES

**Cases:**                                                      **Page(s)**

*In re Abatement Environmental Resources*, 102 Fed. Appx.

272 (4th Cir. 2004), *aff'g* 301 B.R. 830

(D. Md. 2003). .......................................................... 26, 33, 40

*In re Anton Motors, Inc.*,

177 B.R. 58 (Bankr. D. Md. 1995).................................. 26, 39

*Bakst v. Presley (In re E.D. Presley*, Corp.),

44 B.R. 781 (Bankr. S.D. Fla. 1984). .................................. 42

*Bakst v. United States (In re Kane & Kane*,),

479 B.R. 617 (Bankr. S.D. Fla. 2012). ................................ 57

*Bonded Financial Services, Inc. v. European American*

*Bank*, 838 F.2d 890 (7th Cir. 1988). .............................. 59, 61

*Boyer v. Crown Stock Distribution, Inc.*,

587 F.3d 787 (7th Cir. 2009). .................................... 43-44, 53

*In re Brandon Overseas, Inc.*,

2010 WL 281944 (Bankr. S.D. Fla. 2010)........................... 26

*Cameron v. IRS*, 773 F.2d 126 (7th Cir. 1985). ........................... 36

9152933.1

- vi -

**Cases (continued):**                                            **Page(s)**

*In re C.F. Foods, L.P.*,

    265 B.R. 71 (Bankr. E.D. Pa. 2001). ......................... 26, 56-57

*Credit Managers Ass'n of S. Cal. v. Federal Co.*,

    629 F. Supp. 175 (C.D. Cal. 1985)....................................... 47

*Crown Stock Distribution, Inc.*,

    587 F.3d 787 (7th Cir. 2009). .............................................. 44

*In Cybergenics Corp.*, 226 F.3d 237 (3d Cir. 2000)....................... 30

*Dahar v. Jackson*, 459 F.3d 117 (1st Cir. 2006). .................... 42, 44

*In re DBSI, Inc.*, 2011 WL 607442 (Bankr. D. Del. 2011)............ 26

*In re Equipment Acquisition Resources, Inc.*, 485 B.R. 586

    (N.D. Ill. 2012), *appeal pending* (7th Cir. No. 13-1480). 25-26

*FAA v. Cooper*, 566 U.S. __, 132 S. Ct. 1441 (2012). ......... 27-28, 34

*Fidelity Bond and Mortg. Co. v. Brand*,

    371 B.R. 708 (E.D. Pa. 2007)................................................ 42

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley,*

    *Myerson & Casey*, 130 F.3d 52 (2d Cir. 1997). .................... 54

*Florida State Conference of NAACP v. Browning*,

    522 F.3d 1153 (11th Cir. 2008). .......................................... 36

- vii -

**Cases (continued):** **Page(s)**

*In re Gill-LA Lucie Ltd.*, 2010 WL 8756757. ............................... 26

*In re Graham*, 747 F.2d 1383 (11th Cir. 1984). ........................... 30

*In re Grubbs Constr. Co.*,

      321 B.R. 346 (Bankr. M.D. Fla. 2005). .......................... 26, 35

*Kurns v. Railroad Friction Prods. Corp.*,

      __ U.S. __, 132 S. Ct. 1261 (2012). ...................................... 36

*Lane v. Peña,* 518 U. S. 187, 116 S. Ct. 2092 (1996). ................... 27

  * *Martinez v. Hutton*, (In re Harwell),

      628 F.3d 1312 (11th Cir. 2010). ........................ 19, 55, 60, 62

*In re McCook Metals, L.L.C.*,

      2007 WL 4287507 (N.D. Ill. 2007). ............................... 43, 53

*Moody v. Security Pacific Business Credit, Inc.*,

      971 F.2d 1056 (3d Cir. 1992). ........................................ 19, 44

*Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*,

      904 F.2d 588 (11th Cir. 1990). ....................................... 57, 63

*Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*,

      848 F.2d 1196 (11th Cir. 1988). .................................... 54, 61

* Cases or authorities chiefly relied upon are marked with asterisks.

9152933.1

- viii -

**Cases (continued):**                                    **Page(s)**

*In re Pharmacy Distrib. Serv., Inc.*,

    2011 WL 3625049 (Bankr. S.D. Fla. 2011)......................... 26

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,

    __ U.S. __, 132 S. Ct. 2065 (2012)....................................... 31

*Rupp v. Markgraf*, 95 F.3d 936 (10th Cir. 1996)......................... 54

*Security First National Bank v. Brunson (In the Matter of*

    *Coutee)*, 984 F.2d 138 (5th Cir. 1993). ............................ 54-55

*Senior Transeastern Lenders v. Official Committee of Unsecured*

    *Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298

    (11th Cir. 2012). ............................................................ 18, 50

*In re Toy King Distributors, Inc.*,

    256 B.R. 1 (Bankr. M.D. Fla. 2000). ............................... 43, 60

*Umland v. PLANCO Financial Serv., Inc.*,

    542 F.3d 59 (3d Cir. 2008)..................................................... 36

*United States v. Clintwood Elkhorn Mining Co.*,

    553 U.S. 1, 128 S. Ct. 1511 (2008). ...................................... 37

- ix -

**Cases (continued):**                                              **Page(s)**

    * *United States v. Dalm*,

        494 U.S. 596, 110 S. Ct. 1361 (1990). ........................... 25, 28

    * *United States v. Moyer (In re Regency Int'l Flooring, Inc.)*,

        2010 WL 4053982 (W.D. Mich. 2010). ...................... 56, 58-59

    *United States v. Nordic Village, Inc.*,

        503 U.S. 30, 112 S. Ct. 1011 (1992) . ........................ 27-28, 34

    *United States v. Testan*,

        424 U.S. 392, 96 S. Ct. 948 (1976). ..................................... 25

    *United States v. Williams*,

        514 U. S. 527, 115 S. Ct. 1611 (1995). ........................... 27, 38

    *Young v. United States*, 535 U.S. 43, 122 S. Ct. 1036 (2002) ...... 58

**Statutes:**

    26 U.S.C. (Internal Revenue Code.):

        § 1363(a). ................................................................. 4

        § 1366.................................................................... 4

        § 6402.................................................................. 14, 17, 59

        § 6402(a). ............................................................. 63

* Cases or authorities chiefly relied upon are marked with asterisks.

- x -

**Statutes (continued):**                                                    **Page(s)**

§ 6511.................................................................................. 37

§ 7401.................................................................................. 64

§ 7422(a). ...................................................................... 36-38, 41

§ 7426.................................................................................. 38

28 U.S.C.:

§ 158(a)(1)............................................................................ 9

§ 158(d). ............................................................................. 9

§ 2410.................................................................................. 30

§ 157(a). ............................................................................. 9

Bankruptcy Code, 11 U.S.C.:

§ 101(32)(A). ...................................................................... 52

§ 106..................................................................... *passim*

§ 106(a). ................................................................ *passim*

§ 106(a)(1)............................................................. *passim*

§ 106(a)(3). ............................................................... 27

§ 106(a)(5)............................................................. *passim*

§ 544...................................................................... *passim*

§ 544(a). ............................................................... 29, 34

9152933.1

- xi -

**Statutes (continued):** Page(s)

§ 544(b). ........................................................... *passim*

§ 544(b)(1). ...................................................... *passim*

§ 547. ...................................................... 27-29, 38-39

§ 548. ............................................................ *passim*

§ 548(a)(1)(A). ........................................................ 7

§ 548(a)(1)(B). ........................................................ 8

§ 548(a)(1)(B)(i)(II). ............................................... 43

§ 549. ...................................................... 27-29, 38-39

§ 550. ............................................................ 13, 54

§ 550(a). ..................................................... 13, 19, 22

§ 550(a)(1). .................................................. 19, 22, 54

§ 1129(b)(2)(A)(iii). ................................................ 31

Florida Uniform Fraudulent Transfer Act, Fla. Stat.:

§ 726.103(1). ........................................................ 52

§ 726.105(1)(a). ...................................................... 8

§ 726.105(1)(b). ................................................... 9, 43

§ 726.105(1). ......................................................... 8

§ 726.106(1). ...................................................... 8-9

- xii -

**Statutes (continued):**                                      **Page(s)**

§ 726.108................................................................. 8

§ 725.110................................................................. 8

Md. Tax-Prop. Code:

§ 14-905............................................................... 40

§ 14-914............................................................... 40

§ 14-915............................................................... 40

§ 14-916............................................................... 40

**Miscellaneous:**

5 *Collier on Bankruptcy*

¶ 544.02[2] (16th ed. 2012). ............................... 29, 32, 42, 54

*Black's Law Dictionary* 686 (8th ed. 2004). .................................. 42

*Toward True and Plain Dealing: A Theory of Fraudulent*

*Transfers Involving Unreasonably Small Capital,*

21 Ind. L.R. 469 (1988)......................................................... 47

- xiii -

## STATEMENT OF JURISDICTION

This appeal arises from an adversary proceeding filed against the United States in the Chapter 7 bankruptcy case of Custom Contractors, LLC ("debtor"). (Bankr. S.D. Fla. No. 09-24404; AP 1.)[1] The Trustee seeks to recover certain prepetition tax payments under Bankruptcy Code (11 U.S.C.) §§ 544(b), 548(a)(1), 550, and the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. §§ 726.105(1), 726.106(1), 726.108(1), Addendum, *infra*. (AP 1.) To the extent the Trustee sought to recover under FUFTA, the bankruptcy court lacked jurisdiction to adjudicate the claim. *See* Argument I, *infra*. The Bankruptcy Court otherwise had jurisdiction over the adversary complaint as a core proceeding. 28 U.S.C. §§ 157(a), 157(b)(2)(H), 1334.

On April 25, 2012, the bankruptcy court entered a judgment partly in favor of the Trustee and partly in favor of the United States. (AP 155.) The judgment disposed of all claims of all parties. On May 7, 2012, the United States filed a timely notice of appeal from the

---

[1] "AP" references are to the record documents in the adversary proceeding. "Ex." references are to the exhibits admitted to evidence at trial. "Doc." references are to the record documents in the District Court appeal.

- xiv -

judgment.  (AP 164.)  On May 8, 2012, the Trustee cross-appealed.  (AP

167.)  The District Court had jurisdiction over both appeals under

28 U.S.C. § 158(a)(1).

On November 19, 2012, the District Court entered judgment

affirming in part and reversing in part the bankruptcy court's

judgment. (Doc. 15.)  The judgment finally disposed of all claims of all

parties.  On December 12, 2012, the Trustee filed a timely notice of

appeal.  (Doc. 16.)  This Court has jurisdiction under 28 U.S.C. § 158(d).

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

—————————

### No. 12-16489

—————————

### DEBORAH C. MENOTTE,

**Plaintiff - Appellant**

v.

### UNITED STATES OF AMERICA,

**Defendant - Appellee**

—————————

### ON APPEAL FROM THE DECISION OF
### THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA

—————————

### BRIEF FOR THE APPELLEE

—————————

### STATEMENT OF THE ISSUES

The Trustee seeks to avoid and recover from the Internal Revenue Service eight prepetition tax payments made by the debtor on account of the personal income taxes of the debtor's sole owner. The Trustee maintains that the payments were constructively fraudulent under the Bankruptcy Code and the Florida Uniform Fraudulent Transfer Act. The issues are:

-2-

1.  Whether, as to the three payments made more than two years before the petition, Bankruptcy Code § 544(b)(1) – which empowers the trustee to avoid transfers that are "voidable under applicable law by a creditor holding an unsecured claim" – authorized the trustee to avoid federal tax payments as fraudulent transfers under state law, even though no creditor could avoid the payments on that ground.

2.  Whether, in any event, the first seven tax payments were not constructively fraudulent because the debtor had sufficient capital when the payments were made.

3.  The bankruptcy court held that the eighth tax payment was constructively fraudulent.  The third issue is whether that payment nevertheless cannot be recovered because the IRS was a mere conduit and thus not an "initial transferee."

## STATEMENT OF THE CASE

### A.  Course of proceedings and disposition in the courts below

The Trustee sued the United States to recover, as fraudulent transfers, eight tax payments made by the debtor, Custom Contractors, LLC to the Internal Revenue Service on account of the income tax liabilities of its sole owner, Brian Denson.  The bankruptcy court denied

-3-

the Government's motion to dismiss the complaint in part for lack of a

waiver of sovereign immunity, and trial was held.  On the merits, the

bankruptcy court found that the tax payments were not made with

actual fraudulent intent.  Regarding constructive fraud, the bankruptcy

court found that the debtor did not receive reasonably equivalent value

for any of the eight tax payments.  It also found that the debtor was

insolvent at the time of the last of the eight payments, but not the first

seven; accordingly, the bankruptcy court held that only the last

payment was constructively fraudulent and recoverable.  As to the first

seven payments, the bankruptcy court found that the debtor had

adequate capital when the payments were made.  Accordingly, the

bankruptcy court held that those seven payments were not

constructively fraudulent, and thus not recoverable.

Both the United States and the Trustee appealed.  The District

Court affirmed as to the seven payments that were held to be

nonrecoverable, and reversed as to the single payment that was held to

be recoverable.  With respect to the latter payment, the District Court

held that the IRS was a "mere conduit," and thus could not equitably be

required to refund the payment to the Trustee.

9152933.1

-4-

## B.     Statement of facts

## 1.     The debtor's prepetition tax payments

Brian Denson formed the debtor, Custom Contractors, LLC, a single-member limited liability company engaged in commercial construction, in 2006.  (AP 88 at 1-2; AP 140 at 152.)  Denson was the sole owner, manager, and officer of the debtor.  (AP 88 at 2.)

The debtor was a Subchapter S corporation for tax purposes. (AP 140 at 58-59, 62, 91-92.)  As such, it did not pay federal income tax. Instead, its tax attributes "passed through" to Denson, who was required to report the debtor's profits as income on his personal income tax return.  *See* Internal Revenue Code ("I.R.C.") §§ 1363(a), 1366 (26 U.S.C.).

Denson reported receiving salary from the debtor in the amount of $150,000 in 2007, and $162,739 in 2008.  (Ex. B p.26; Ex. C Form W-2.)  Federal income taxes were withheld from Denson's salary and paid over to the IRS by the debtor.  (*Ibid*.; AP 140 at 54.)  Estimated taxes owed by Denson on the income passed through to him were also paid from the debtor's bank account.  (AP 140 at 54-55, 104, 149-51.)

In 2007 and 2008, the debtor made eight tax payments to the IRS on behalf of Denson.  (Ex. 2-9.)  The dates and amounts of the

-5-

payments, and the manner in which they were applied, are summarized

in the following table:

| Payment No. | Date of check | Amount of payment | Application of payment |
|---|---|---|---|
| 1 | 4/16/07 | $73,801.00 | Denson's 2006 personal income tax |
| 2 | 4/16/07 | $22,110.00 | Denson's estimated 2007 personal income tax |
| 3 | 6/1/07 | $22,110.00 | Denson's estimated 2007 personal income tax |
| 4 | 4/1/08 | $26,380.00 | Denson's estimated 2008 personal income tax (REFUNDED to Denson) |
| 5 | 4/9/08 | $2,644.00 | Balance due on Denson's 2007 personal income tax |
| 6 | 6/3/08 | $26,380.00 | Denson's estimated 2008 personal income tax (REFUNDED to Denson) |
| 7 | 6/30/08 | $151.25 | Denson's penalty for failure to make sufficient estimated 2007 personal income tax payments |
| 8 | 9/15/08 | $26,380.00 | Denson's estimated 2008 personal income tax (REFUNDED to Denson) |

(AP 1 at 15-23; AP 88 at 2-3; AP 154 at 2; Ex. 2-9, T-X.)

Denson received a refund of the full amount of the three 2008

estimated tax payments that the debtor made on his behalf, because

9152933.1

-6-

the debtor operated at a loss in 2008, and Denson did not owe any income tax for that year.  (Ex. C, X.)  Denson did not repay the refund to the debtor.  (AP 140 at 106.)

## 2.   The debtor's business operations

The debtor commenced operations in 2006 with $1,000 of paid-in capital.  (AP 140 at 25.)  According to an internal financial statement, at the end of 2006, the debtor's assets exceeded its liabilities by approximately $195,000.  (Ex. 47 at 38.)  From its inception through 2007, the debtor's operations were profitable and it maintained sufficient cash reserves.  (AP 140 at 186; Ex. 47 at 38.)  In 2007, according to the Trustee's expert witness, the debtor had net income of approximately $679,000.  (Ex. 47 at 39.)  At the end of the year its assets exceeded its liabilities by approximately $730,000 and it had working capital (i.e., current assets in excess of current liabilities) of approximately $528,000.  (Ex. 47 at 38.)

In 2008, the debtor began to feel the effects of the economic downturn in the Treasure Coast area of Florida, where it did business.  (AP 140 at 171, 187.)  Nevertheless, on June 30, 2008, according to the Trustee's expert witness, the debtor still had working capital of approximately $266,000.  (Ex. 47 at 38.)  In the fall of 2008, however,

9152933.1

-7-

the debtor was forced to draw on a bank line of credit.  (AP 140 at 188.)

By the end of 2008, the debtor had negative working capital in the

amount of approximately $265,000.  (Ex. 47 at 38.)  In 2009, the

debtor's business operations and financial condition continued to

worsen.  (AP 140 at 189.)  On July 15, 2009, the debtor filed a petition

for relief under Chapter 7 of the Bankruptcy Code.  (Bankr. S.D. Fla.

No. 09-24404.)

### 3.    The adversary proceeding

In her complaint, the Trustee sought to recover, from the IRS, all

eight prepetition tax payments that the debtor made on behalf of

Denson. The Trustee sought to recover the payments made in 2008

(Nos. 4-8 in the chart above) under Bankruptcy Code § 548, Addendum,

*infra.*  (AP 1.)  Under § 548, the trustee may avoid a transfer of an

interest of the debtor in property made within two years before the

petition date, under either of two theories.  The first theory, "actual

fraud," allows the Trustee to avoid a transfer made "with actual intent

to hinder, delay, or defraud" a creditor.  § 548(a)(1)(A).  The second

theory, "constructive fraud," allows the Trustee to avoid a transfer if

the debtor "received less than a reasonably equivalent value" in

exchange for the transfer or obligation, and, as relevant here, the

9152933.1

-8-

debtor was insolvent or became insolvent when the transfer was made, or "any property remaining with the debtor was an unreasonably small capital." § 548(a)(1)(B).

The tax payments made in 2007 (Nos. 1-3 in the chart above) were not recoverable under § 548 because they were made more than two years before the petition date of July 15, 2009.  The Trustee, however, sought to recover the 2007 tax payments under Bankruptcy Code § 544, Addendum, *infra*.  (AP 1.)  Under § 544(b)(1), a trustee may avoid the debtor's transfer of an interest in property "that is voidable under applicable law by a creditor holding an unsecured claim."  The applicable law, the Trustee contended, was the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. §§ 726.105(1), 726.106(1) and 726.108(1), Addendum, *infra*.  (AP 1.)  FUFTA provides that creditors may avoid certain transfers by debtors, generally up to four years after the transfer was made.  Fla. Stat. §§ 726.108, 726.110.

Like the Bankruptcy Code, FUFTA provides that a transfer may be avoided if made "with actual intent to hinder, delay, or defraud any creditor of the debtor." § 726.105(1)(a).  A transfer also may be avoided if it was made "without receiving a reasonably equivalent value in exchange," and, as relevant here, either the debtor was insolvent or the

-9-

"remaining assets of the debtor were unreasonably small."

§§ 726.105(1)(b), 726.106(1).

### 4.    The bankruptcy court's decision

a.  The Government moved to dismiss the adversary complaint in part.  (AP 7.)  Bankruptcy Code § 106 provides that "sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section," and lists, *inter alia*, § 544, under which the Trustee sought to recover the first three of the eight tax payments at issue (*i.e,* the payments made more than two years before the petition was filed). In the motion to dismiss, the Government argued, *inter alia*, that the trustee could not avoid those payments because no unsecured creditor of the bankruptcy estate could maintain an action to avoid them under any applicable law.  (*Ibid.*)  The Government thus asserted that the adversary complaint should be dismissed with respect to the first three payments.  (*Ibid.*)

The bankruptcy court denied the motion to dismiss.  (AP 16.)  The court held that "by including § 544 in the list of Bankruptcy Code sections set forth in § 106(a), Congress knowingly included state law causes of action within the category of suits to which a sovereign immunity defense could no longer be asserted."  (*Id.* at 7; citations

9152933.1

-10-

omitted).  The court stated that the sovereign immunity argument must fail "in light of the unambiguous language of § 106, as supported by the legislative history; the specific inclusion of § 544 in § 106; the precedent for Congress providing a trustee with rights that are greater than those possessed by the unsecured creditor upon whom a § 544 claim is based; and the policy reasons favoring recovery for the benefit of all creditors." (*Id*. at 9; citations omitted.)  The court added that the "applicable law" referenced in § 544(b) "generally contemplates state law." (*Ibid*.)  The court held that to require a trustee to demonstrate that the United States has waived sovereign immunity every time the trustee seeks to rely on state law under § 544 "would render the general abrogation of sovereign immunity under § 106 almost meaningless." (*Id*. at 9.)

b.  Trial was held, and the bankruptcy court issued its opinion holding that only the eighth and final tax payment was recoverable by the Trustee.  (AP 154.)  The bankruptcy court first found that none of the tax payments were made with actual fraudulent intent.  (AP 154 at 6-10.)  That finding is not at issue here.

The bankruptcy court then considered the Trustee's argument that the tax payments were constructively fraudulent.  (AP 154 at 10.)

9152933.1

-11-

In that regard, the Trustee contended that the debtor received less than "a reasonably equivalent value in exchange" for the payments and that either (i) the debtor was insolvent or became insolvent as a result of the transfer, or (ii) any property remaining to the debtor was "an unreasonably small capital." (AP 154 at 10-11.) The bankruptcy court found that the debtor did not receive a reasonably equivalent value in exchange for the payments, because the payments did not satisfy its tax liabilities, but rather were paid on account of Denson's tax liabilities. (AP 154 at 13.) That finding is also not at issue in this appeal.

The bankruptcy court then analyzed the debtor's solvency when the payments were made. (AP 154 at 13.) The Trustee's expert witness, who testified (AP 140 at 6-100) and submitted a report regarding the debtor's solvency (Ex. 47), opined that the debtor was solvent through June 2008, at which time its assets exceeded its liabilities by an estimated $365,000, but that the debtor was insolvent in September 2008, when the eighth and final payment was made. (AP 140 at 65; Ex. 47 at 30-31, 38.) The bankruptcy court found that Denson's testimony that he began to feel financial pressure in the latter part of 2008 supported that conclusion. (AP 154 at 14-15; AP 140 at 183.) Because the debtor received less than a reasonably equivalent

-12-

value in exchange for the final payment and was insolvent when the eighth payment was made, the bankruptcy court held that the payment was constructively fraudulent and that the Trustee accordingly could recover the payment.  (AP 154 at 15.)

The bankruptcy court next addressed the Trustee's contention that the first seven tax payments left the debtor with "unreasonably small capital."  That term means, the bankruptcy court observed, "the inability to generate sufficient profits to sustain operations."  (AP 154 at 16; citation omitted.)  Because the debtor's financial statements, as adjusted by the Trustee's expert, indicated that the debtor had working capital of about $730,000 at the end of 2007, the bankruptcy court held that the debtor did not have unreasonably small capital when the first three payments were made.  (AP 154 at 15-16; Ex. 47 at 30, 38.)

As to payments four through seven, which were made in April and June 2008, the bankruptcy court also rejected the expert witness's conclusion that the debtor's capital was unreasonably small.  The bankruptcy court noted that the expert's report showed that on June 30, 2008, after those payments had been made, the debtor had working capital in the amount of $266,323, and no bank debt.  (AP 154 at 21; Ex. 47 at 30, 38.)  To the extent that the opinion of the expert

-13-

witness was based on the need for additional capital because of the risk of being in the construction industry in the middle of a downturn (*see* Ex. 47 at 32), the court stated, the testimony "appears to suffer from the influence of hindsight bias." (AP 154 at 18.) The bankruptcy court thus concluded that the first seven tax payments did not leave the debtor with unreasonably small capital, and thus those payments were not constructively fraudulent. (*Ibid*.)

The United States argued, despite the bankruptcy court's finding that the eighth payment was constructively fraudulent, that the Trustee could not recover that payment. Bankruptcy Code § 550(a) provides that to the extent that a transfer is avoided, the trustee may recover the property transferred from the "initial transferee." Because the IRS refunded the final payment once it became clear that Denson had no tax liability for the year for which it was paid (2008), the Government invoked an equitable exception to § 550, under which a transferee who acts in good faith and who lacks dominion and control over the payment – who is a "mere conduit" – is not considered an initial transferee under § 550. (AP 154 at 22.)

The bankruptcy court held, however, that to take advantage of that equitable exception to § 550, the IRS must not have had control

-14-

over the payment. (*Id*. at 25-26.) That requirement was not met, the court held, because under I.R.C. § 6402, the Secretary of the Treasury has authority to credit overpayments against a taxpayer's liability for certain other federal and state obligations. (*Id*. at 26.) Moreover, the bankruptcy court noted, the payment at issue was available for general use by the Government, and was not kept in a segregated account. (AP 141 at 275-76.) The court acknowledged that this result produced a dilemma, because the IRS was required to refund the payment twice, but stated that it was bound by this Court's precedent in its construction of the conduit defense. (AP 154 at 25-27.) The court accordingly held that "the IRS was an initial transferee with dominion and control . . . rather than a mere conduit." (*Id*. at 26.)

In accordance with its opinion, the bankruptcy court entered judgment in favor of the Trustee stating that the eighth payment, in the amount of $26,830, was constructively fraudulent and could be recovered from the United States. (AP 155.)

### 5.   The District Court's decision

On appeal to the District Court, the Trustee argued that, contrary to the bankruptcy court's holding, the debtor was operating with "unreasonably small capital" in 2007 and the first two quarters of 2008,

-15-

when the first seven tax payments were made.  The District Court

noted that the term "unreasonably small capital" refers to a situation

where the transferor is "technically solvent but doomed to fail," or

where bankruptcy is "both likely and foreseeable."  (Doc. 15 at 6;

citations omitted.)  The District Court upheld the bankruptcy court's

finding that the debtor was not operating with unreasonably small

capital when the first seven tax payments were made.

    As to the first three payments (made in 2007), the District Court

found that the bankruptcy court had "clear and convincing support" for

its finding that the debtor had around $730,000 in working capital at

the end of the year.  (*Ibid*.)  As to the first two quarters of 2008, when

payments 4-7 were made, although it was a "closer question," the

bankruptcy court "properly evaluated the evidence" in finding that

taxpayer's capital was not unreasonably small.  Although the Trustee's

expert witness asserted that the debtor required additional capital

"because of the risk of being in the construction industry in the middle

of a downturn," the bankruptcy court did not clearly err when it

discredited that opinion as being influenced by "hindsight bias,"

particularly given Denson's testimony that he did not feel financial

pressure until late 2008.  (*Id*. at 7.)  Moreover, the District Court

-16-

stated, the bankruptcy court properly disregarded some of the

comparative financial data on which the expert witness relied, because

the companies to which the debtor was compared were not in fact

comparable.  (*Ibid*.)

The District Court rejected as "without merit" the Trustee's

argument that the bankruptcy court erred by failing to consider

relevant evidence.  (*Id*. at 8-9.)  The District Court explained that the

bankruptcy court had merely discredited certain evidence, for reasons

that were supported by the record.  (*Id*. at 9.)  In particular, the expert

witness's own computations showed that the debtor was not operating

with unreasonably small capital when the first seven payments were

made.  (*Ibid*.)  The District Court accordingly held that the bankruptcy

court's finding that the debtor did not have "unreasonably small

capital" when the first seven payments were made was not clearly

erroneous.  (*Id*. at 8.)

Turning to the Government's appeal, the District Court noted that

the "mere conduit" exception to liability of an "initial transferee"

applies where the transferee (i) did not have control over the assets

received, but instead merely served as a conduit, and (ii) acted in good

faith, as an innocent party to the transfer.  (Doc. 15 at 12; citation

9152933.1

-17-

omitted.)  In making that determination, the court took a "flexible, pragmatic, equitable approach," considering "the circumstances of the transaction in its entirety."  (*Ibid*.; citation omitted.)

The District Court held that the bankruptcy court erred in holding that the IRS did not qualify for the conduit defense, because "the equitable approach adopted by the Eleventh Circuit, when looking at the transaction in its entirety, would extend the conduit defense to the present situation."  (*Ibid*.)  Although I.R.C. § 6402 gives the IRS the right to reduce a refund by the amount the taxpayer owes for past taxes, the court stated, here "the IRS had no discretion in whether to accept the payment on behalf of Denson or to refund the payment to him."  (*Id*. at 13.)  Indeed, "when Denson had no tax liability for 2008 and no prior tax liabilities, the IRS was legally obligated to refund the prepayment to Denson when he requested a refund."  (*Ibid*.)

Looking at the transaction in its entirety, the court stated, "the IRS exercised no discretion and the mere fact that Section 6402 allows an offset in certain situations does not preclude the determination that the IRS was acting as a mere conduit when receiving and refunding a payment at the direction of the Debtor."  (*Id*. at 13-14.)  Nor did the fact that the payment was commingled with other funds affect that

-18-

analysis, because "the transfer was simply a prepayment for Denson's estimated tax liability which could not be determined until the end of the tax year." (*Id*. at 14.)  The court concluded that equity required treating the IRS as a mere conduit in order to avoid the "illogical outcome where the IRS is in essence liable twice for the payment - once for the refunded amount to Denson and then to the Trustee under Section 550(a)." (*id*. at 14-15.)

The court further noted that "[i]mposing a duty of due diligence on the IRS to investigate the solvency of entities making payments and the relationship to a taxpayer would essentially cripple the efficiency of the IRS," and would "ignore the unique role of the IRS . . . of collecting taxes, funding the Treasury, and processing refunds." (*Id*. at 16; citation omitted.)

In accordance with its opinion, the District Court entered judgment in favor of the United States.  (Doc. 16.)

### C.    Statement of the standard or scope of review

As the second court of review, this Court reviews the order of the bankruptcy court independently of the district court.  *Senior Transeastern Lenders v. Official Committee of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298, 1310 (11th Cir. 2012).  The scope of the

9152933.1

-19-

waiver of sovereign immunity of Bankruptcy Code § 106 is a question of law, reviewable *de novo*.

Adequacy of capital presents a mixed question of law and fact. The criteria applied, such as the consideration given to availability of credit, are reviewed *de novo*. *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1063 (3d Cir. 1992). The findings underlying the adequacy of capital analysis are reviewed under the clearly erroneous standard. *Ibid*.

The applicability of the "mere conduit" exception to the "initial transferee" rule of Bankruptcy Code § 550(a) is an equitable determination reviewable for abuse of discretion. *TOUSA*, 680 F.3d at 1310; *see also Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1323 (11th Cir. 2010) ("recipients of the debtor's fraudulently-transferred funds who seek to take advantage of equitable exceptions to § 550(a)(1)'s statutory language must establish" elements of exception).

## SUMMARY OF ARGUMENT

1. The Trustee brought this adversary proceeding seeking to avoid and recover eight prepetition tax payments made by the debtor on account of the personal income taxes of the debtor's sole owner, Brian Denson. The bankruptcy court denied the Government's motion

-20-

to dismiss as to the first three payments, holding that Bankruptcy Code
§ 106 waives sovereign immunity to allow the Trustee to bring suit
under FUFTA.

Section 106(a)(1) of the Bankruptcy Code provides that "sovereign
immunity is abrogated as to a governmental unit to the extent set forth
in this section with respect to" 59 sections of the Bankruptcy Code,
including § 544.  But § 106(a)(5) provides that nothing in § 106(a)
creates a substantive claim for relief or cause of action that does not
exist under the Bankruptcy Code or Rules, or under nonbankruptcy
law.  Section 544(b)(1) permits the trustee to avoid only those transfers
that a voidable under applicable law by an unsecured creditor.  There is
no nonbankruptcy law that would permit an unsecured creditor to
recover a federal tax payment as a fraudulent transfer, and, moreover,
the Internal Revenue Code preempts reliance upon state law for that
purpose.  Thus, by permitting this case to go forward, the bankruptcy
court below erroneously construed § 106(a) as creating a substantive
claim for relief against governmental units that does not exist under
nonbankruptcy law.

2.  To the extent the Trustee sought to recover under § 548 (and
§ 544(b)(1), if "applicable" defenses are deemed to be overridden), the

-21-

judgment of the District Court should be affirmed.  The bankruptcy court held, and the District Court agreed, that the first seven payments were not constructively fraudulent.  To prevail on that issue, the Trustee was required to show that those payments were made while the debtor was insolvent or had "unreasonably small capital."  The courts below held that the debtor was not insolvent and did not have "unreasonably small capital" when the first seven payments were made.  This is essentially a factual issue, and the record fully supports the bankruptcy court's holding.

The most important fact here is that even as late as the seventh payment (in June 2008), the debtor had at least $266,000 in working capital.  That fact alone is a strong indication that the taxpayer was not on the brink of being unable to continue its operations, the standard for "unreasonably small capital."  While the Trustee asserts generally that the working capital figures are unreliable, she points to no hard evidence that it was reasonably foreseeable at the time the payments were made that the debtor would be unable to continue in business.  Even if that may have been a reasonable inference based on the evidence, there are no grounds on which to overturn the bankruptcy

-22-

court's holding that the debtor's capital was not unreasonably small when payments 1-7 were made.

3.  The IRS received the eighth payment from the debtor on account of the estimated 2008 income tax liability of Denson.  As it turned out, Denson had no tax liability for that year, so the IRS refunded the payment to him.  Under these circumstances, the District Court correctly held that the IRS is not an "initial transferee" from whom the Trustee can recover under Bankruptcy Code § 550(a).

A party acting merely as a conduit that facilitates the transfer from the debtor to a third party is not a "transferee," and therefore not the initial transferee within the meaning of § 550(a)(1).  Recipients of a debtor's fraudulently transferred funds who seek to take advantage of this exception must establish (1) that they did not have control over the assets received, i.e., that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor, and (2) that they acted in good faith, as an innocent participant in the fraudulent transfer.

The IRS accepted the eighth payment subject to the contingency that the payment would be refunded if it turned out that Denson had no tax liability, and that is in fact what happened.  To impose upon the

9152933.1

-23-

Government an obligation to refund the payment a second time would not only be fundamentally unfair – by resulting in a double refund – it would also place the Government in the untenable situation of being responsible for insuring the capital and solvency of anyone who makes a tax payment. The purpose of allowing the Trustee to recover fraudulently conveyed prepetition payments from an initial transferee is to protect creditors from debtors' diverting their assets to less deserving payees. If, as was the case here, the recipient has no right to retain the payment, but instead serves as a mere conduit, with no right to retain the payment and no reason to know that the payment works a fraud on creditors, it does not serve the purposes of the bankruptcy law to impose strict liability on that recipient. That is true even where, as here, some time elapses before the IRS learns that it must refund the payment. The District Court correctly held that the IRS was a "mere conduit" with respect to the eighth and final payment.

The case should be remanded with instructions to dismiss the complaint with respect to the first three payments, and the judgment of the District Court should otherwise be affirmed. In the alternative, the judgment of the District Court should be affirmed.

-24-

# ARGUMENT

## I

**The inclusion of § 544 in the list of Bankruptcy Code provisions in respect to which sovereign immunity is abrogated does not override the specific requirement in § 544(b)(1) that a transfer be "voidable under applicable law by a creditor holding an unsecured claim"**

1. The Trustee brought this action seeking to avoid, as fraudulent transfers, eight prepetition tax payments that the debtor-corporation made on behalf of its sole owner. The Trustee relied upon Bankruptcy Code § 548 to recover payments 4 through 8. But because § 548 permits the avoidance of only those transfers made within two years before the bankruptcy petition, she sought to recover payments 1 through 3 under § 544(b)(1), which empowers a trustee to avoid any transfer of a debtor's property that is "voidable under applicable law by a creditor holding an unsecured claim that is allowable" in the bankruptcy case. As discussed below, there is no applicable law that would permit an unsecured creditor of the debtor's bankruptcy estate to recover payments 1 through 3 from the United States. The Trustee's claim for those payments therefore did not fall within the scope of the waiver of sovereign immunity set forth in §§ 106(a)(1) and 544(b)(1),

-25-

and the bankruptcy court lacked jurisdiction to adjudicate the claim. *See, e.g., United States v. Dalm,* 494 U.S. 596, 608, 110 S. Ct. 1361, 1368 (1990), *quoting United States v. Testan*, 424 U.S. 392, 299, 96 S. Ct. 948, 953 (1976) ("the terms of [the Government's] consent to be sued in any court define that court's jurisdiction to entertain the suit").

Section 106 of the Bankruptcy Code, which provides the waiver of sovereign immunity in bankruptcy for all "governmental units," was amended in 1994. Congress specifically provided at that time that "[n]othing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or nonbankruptcy law." Bankruptcy Code § 106(a)(5). The bankruptcy court's decision permitting the Trustee's § 544(b)(1) claim to proceed runs afoul of this provision. Indeed, prior to the 1994 amendment, no court (as far as we have been able to determine) had ever held that a creditor of one person could sue a taxing authority – federal or state – to recover as a fraudulent transfer a tax payment that that person had made on behalf of another.

Since the 1994 amendment, however, several lower courts have concluded that § 544(b)(1) permits bankruptcy trustees to recover federal tax payments as fraudulent transfers. *See In re Equipment*

-26-

*Acquisition Resources, Inc.*, 485 B.R. 586 N.D. Ill. 2012), *appeal pending* (7th Cir. No. 13-1480); *In re C.F. Foods, L.P.*, 265 B.R. 71 (Bankr. E.D. Pa. 2001); *In re Brandon Overseas, Inc.*, 2010 WL 281944 (Bankr. S.D. Fla. 2010); *In re DBSI, Inc.*, 2011 WL 607442 (Bankr. D. Del. 2011); *In re Pharmacy Distrib. Serv., Inc.*, 2011 WL 3625049 (Bankr. S.D. Fla. 2011). In contrast, state tax authorities have had some success in persuading the lower courts that § 544(b)(1) does not authorize trustees to recover state tax payments as fraudulent transfers. *See In re Grubbs Constr. Co.*, 321 B.R. 346 (Bankr. M.D. Fla. 2005); *In re Anton Motors, Inc.*, 177 B.R. 58 (Bankr. D. Md. 1995); *In re Gill-LA Lucie Ltd.*, 2010 WL 8756757 (Bankr. S.D. Fla. 20100. No court of appeals has yet addressed the issue.[2]

---

[2] In *In re Abatement Environmental Resources, Inc.*, 102 Fed. Appx. 272, 274 n.2 (4th Cir. 2004), *aff'g* 301 B.R. 830 (D. Md. 2003), the Fourth Circuit stated, *in dicta*, that "[t]here is no sovereign immunity bar to the Trustee's claim [to recover a federal tax payment under state fraudulent-transfer law] because 11 U.S.C.§ 106(a)(1) abrogates the United States' sovereign immunity for actions brought pursuant to 11 U.S.C. § 544(b)(1)." But the Fourth Circuit provided no analysis of the issue, and there is no indication that the quoted statement in that unpublished opinion reflects the court's considered judgment of the issue. The Fourth Circuit went on to reject the trustee's fraudulent-transfer claim on the merits.

-27-

2.  Section 106(a)(1) provides that sovereign immunity is abrogated "with respect to" 59 specified sections of the Bankruptcy Code, including those that permit the trustee to avoid transfers of the debtor's property (§§ 544, 547, 548, and 549) and to recover the value of the property transferred (§ 550).  Section 106(a)(3) empowers the bankruptcy courts to issue monetary judgments (but not including punitive damages) against governmental units under the sections listed in § 106(a)(1).  But § 106(a)(5) cautions, as noted above, that nothing in § 106(a) creates a substantive claim for relief or cause of action that does not exist under the Bankruptcy Code or Rules, or under nonbankruptcy law.

The Supreme Court "ha[s] said on many occasions that a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text."  *FAA v. Cooper*, 566 U.S. __, 132 S. Ct. 1441, 1448 (2012).  *See also*, *Lane* v. *Peña*, 518 U. S. 187, 192, 116 S. Ct. 2092, 2096 (1996); *United States* v. *Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S. Ct. 1011 (1992).  Any ambiguities in the statutory language are to be construed in favor of immunity, *United States* v. *Williams*, 514 U. S. 527, 531, 115 S. Ct. 1611, 1616 (1995), so that the Government's consent to be sued is never enlarged beyond what a fair reading of the text requires, *United*

-28-

*States v. Dalm*, 494 U. S. at 608, 110 S. Ct. at 1368.  Ambiguity exists if there is a "plausible" interpretation of the statute that would not authorize a monetary judgment against the Government.  *FAA v. Cooper*, 132 S. Ct. at 1448; *Nordic Village*, 503 U.S. at 37.  The statutory waiver applicable to this case – Bankruptcy Code § 106(a)(1), in combination with § 544(b)(1) – does not "unequivocally express" a Congressional intent to permit bankruptcy trustees to recover federal tax payments under state fraudulent-transfer laws, given § 544(b)(1)'s specific requirement that the transfer be avoidable by an unsecured creditor under applicable nonbankruptcy law.

Sections 547, 548, and 549 of the Bankruptcy Code, which are among the 59 sections listed in § 106(a)(1), do not raise a similar issue because they are creatures of bankruptcy law.  Under § 547, the trustee may avoid "preferences," defined generally as transfers of the debtor's property to a creditor within 90 days before bankruptcy on account of an antecedent debt.  Under § 548, the trustee may avoid fraudulent transfers (defined generally – but not wholly – in a manner consistent with state fraudulent-transfer laws) that were made within two years before bankruptcy.  And under § 549, the trustee may avoid postpetition transfers of the estate's property that were not authorized

9152933.1

-29-

by the Bankruptcy Code or by the court.  Because the avoidance actions under §§ 547, 548, and 549 are created by, and exist under, the Bankruptcy Code, they do not fall within the proscription of § 106(a)(5), and § 106(a)(1) therefore contains the requisite "unequivocal expression" of an intent to waive sovereign immunity with respect to these provisions.

Section 544, however, unlike §§ 547, 548, and 549, does not itself define the claim for relief or substantive cause of action.  Instead, the trustee's rights under § 544 are entirely derivative.  Section 544(*a*) permits the trustee to avoid transfers of the debtor's property that are voidable by, and to exercise the rights of, a hypothetical judgment lien creditor, execution creditor, or bona fide purchaser that obtains its interest on the petition date.  This provision is most commonly used by trustees to avoid, or to assert priority over, the liens of creditors who assert that their claims are secured.  *E.g.* 5 *Collier on Bankruptcy* ¶ 544.02[2] (16th ed. 2012) ("The purpose of the strong arm clause is to cut off unperfected security interests, secret liens, and undisclosed prepetition claims against the debtor's property").  When § 544(a) is relied upon for this purpose, there generally would be no issue concerning a waiver of the United States' sovereign immunity, because

-30-

28 U.S.C. § 2410 permits judgment lien creditors, execution creditors, and bona fide purchasers to quiet title to property on which the United States claims a lien.  The listing of § 544 in § 106(a)(1) enables the trustee to maintain against the United States, in the bankruptcy forum, the same actions that § 2410 enables creditors and purchasers to maintain in the district courts.

Section 544(*b*), in turn, permits the trustee to avoid transfers that an actual unsecured creditor of the bankruptcy estate could avoid "under applicable law."  The applicable law that trustees most frequently rely upon under Section 544(b) is state fraudulent-transfer law.  *See* 5 *Collier on Bankruptcy* ¶ 544.06[2].  But whatever theory the trustee relies upon, the plain language of § 544(b)(1) permits an avoidance action by the trustee *only* if there is an unsecured creditor of the estate that could maintain such an action.  *See In re Graham*, 747 F.2d 1383, 1386 (11th Cir. 1984) (§ 544(b) "gives a trustee-in-bankruptcy the power to avoid any transfer that unsecured creditors could have avoided under federal or state law"); *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) (trustee may invoke Section 544(b) "only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action").  Thus, if an applicable law

-31-

permits an unsecured creditor to avoid a transfer made by the debtor to a governmental unit, then, by reason of §§ 106(a)(1) and 544(b)(1), sovereign immunity has been unequivocally waived so as to permit a bankruptcy trustee to avoid that same transfer – and to do so in the bankruptcy forum.

This reasoning is supported by the "commonplace" rule of statutory construction "that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, __ U.S. __, 132 S. Ct. 2065, 2068 (2012). In *RadLAX*, the Supreme Court applied that rule to reject as "hyperliteral and contrary to common sense" the notion that §1129(b)(2)(A)(iii) of the Bankruptcy Code "permits precisely what clause (ii) proscribes." *Id.* Similarly, § 106(a)(1) should not read to permit precisely what § 544(b)(1) proscribes, that is, to permit a trustee to avoid a transfer that a creditor could not avoid under applicable nonbankruptcy law.

Simply put, §§ 106(a)(1) and 544(b)(1) do not, as the bankruptcy court below construed those provisions, unequivocally express a Congressional intent to waive sovereign immunity with respect to any and all actions that an unsecured creditor could maintain against a private party under state law. Section 106(a)(1) waives sovereign

-32-

immunity "with respect to" § 544, and § 544(b)(1) permits the trustee to
avoid only those transfers that an unsecured creditor could avoid.
Under the plain statutory language, if an unsecured creditor could not
avoid a transfer, then the trustee, standing in the shoes of the creditor,
likewise cannot avoid it.  In other words, if an unsecured creditor could
not, for any reason, sue a governmental unit to avoid a transfer, then
the trustee similarly cannot avoid the transfer.  *See* 5 *Collier on
Bankruptcy*, ¶ 544.06[1] ("If there are no creditors against whom the
transfer is voidable under applicable law, the trustee is powerless to act
under section 544(b)(1)").  Under this interpretation of the statute, if, for
example, a state were to waive sovereign immunity so as to permit a
creditor to sue *in state court* to avoid a transfer made to the state
government, then the trustee, by reason of the waiver in §§ 106(a)(1)
and 544(b)(1), would be able to bring a similar action against the state
in the bankruptcy courts.  The trustee would not be able to do so
without the waiver provided by § 106(a)(1).

That § 106(a)(1)'s reference to § 544 should not be read so
expansively as to expose the United States to state-law fraudulent-
transfer actions is reinforced by the proscription in § 106(a)(5) that
nothing in § 106(a) "shall create" a substantive claim for relief or cause

-33-

of action not otherwise existing under the Bankruptcy Code or rules, or under nonbankruptcy law.  Outside of bankruptcy, no law permits an unsecured creditor to recover a federal tax payment as a fraudulent transfer.  And we are not aware of any state court decisions allowing such a remedy to recover state tax payments.  *See, e.g., Abatement Environmental Resources*, 102 Fed. Appx. at 275 ("This attempt to use a state law fraudulent conveyance action as a tax recovery provision clearly does not conform to the origins or purposes of fraudulent conveyance doctrine").  By permitting this case to go forward, the bankruptcy court below erroneously construed § 106(a) as creating a substantive claim for relief against governmental units that never before existed.

In support of its conclusion, the bankruptcy court reasoned that if a trustee were required to demonstrate that the United States has waived sovereign immunity in every instance in which the trustee relies on state law for purposes of § 544, it "would render the general abrogation of sovereign immunity under § 106 almost meaningless." (Doc. 16, at 9.)  This is demonstrably not the case, however, because a trustee can maintain an avoidance action against the United States

-34-

under § 544(a), at least where one of the hypothetical

creditors/purchasers identified in that subsection could to so.

The bankruptcy court also reasoned that because a trustee's

recovery is not limited to the amount of the claim of the creditor in

whose shoes she stands, the trustee's rights are greater than those

possessed by such a creditor.  (AP 16 at 9.)  This, however, is not a basis

upon which to override § 544(b)(1)'s express requirement that the

transfer be avoidable by a creditor in the first instance.

In any event, the bankruptcy court's interpretation of §§ 106(a)(1)

and 544 is not enough to overcome the "unequivocal expression"

standard that the Supreme Court has long – and recently – applied.

*E.g., FAA v. Cooper, supra.*  As the Court held in *Nordic Village*, a

"plausible" interpretation of the statute supporting sovereign immunity

"is enough to establish that a reading imposing monetary liability on the

Government is not 'unambiguous' and therefore should not be adopted."

503 U.S. at 37.  It is surely "plausible" to read the statutes here at issue

as waiving immunity only to permit the trustee to bring a § 544(b)

avoidance action against a governmental unit in instances where

immunity has already been waived under another "applicable law."

Indeed, that is exactly how the bankruptcy court interpreted those

-35-

statutes in *In re Grubbs Construction Co., supra.*  In that case, the court

held that a trustee could not recover a *state* tax payment under Florida

fraudulent transfer law because the Florida legislature had not waived

its immunity with respect to such an action.  321 B.R. at 352 ("Nowhere

in the Florida Statutes does there exist an affirmative waiver of

immunity as to a fraudulent transfer action under Chapter 726").

Because this interpretation of the statutory provisions at issue is

plausible, it follows that § 106(a)(1), by its reference to § 544, does not

unequivocally waive the United States' immunity with respect to state-

law fraudulent-transfer actions.

3.     Even if, as the bankruptcy court below concluded, there does

not have to be a separate waiver of sovereign immunity that would

permit an unsecured creditor to recover a federal tax payment under

state fraudulent-transfer law, that does not end the matter.  Contrary to

the bankruptcy court's understanding, state fraudulent-transfer law is

not the only "applicable law" within the meaning of § 544(b)(1).  Another

applicable law is the Internal Revenue Code (26 U.S.C.), which is

comprehensive and which preempts state-created remedies for

recovering federal tax payments.  Indeed, as discussed below, the

Internal Revenue Code contains a provision that would specifically bar

-36-

an unsecured creditor from recovering a federal tax payment under a

state's fraudulent-transfer law (at least where, as here, no

administrative claim for refund has been filed).  And because an

unsecured creditor could not bring such a claim, an action by a

bankruptcy trustee to recover a tax payment under such a theory would

similarly be barred, and therefore would not fall within the scope of the

waiver set forth in §§ 106(a)(1) and 544(b)(1).

State law is preempted "when the scope of a [federal] statute

indicates that Congress intended federal law to occupy a field

exclusively."  *Kurns v. Railroad Friction Prods. Corp.*, __ U.S. __,

132 S. Ct. 1261, 1266 (2012).  *See also, Florida State Conference of*

*NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008).  The

Internal Revenue Code is a comprehensive statutory scheme that

occupies the entire field of imposing and collecting federal taxes, and

providing the remedies for wrongful collection.  *E.g., Umland v.*

*PLANCO Financial Serv., Inc.*, 542 F.3d 59 (3d Cir. 2008) (holding that

the Internal Revenue Code, and particularly I.R.C. § 7422(a), barred a

state-law unjust enrichment claim by an employee against an employer

that withheld the employee's taxes).  *Cf., Cameron v. IRS*, 773 F.2d 126,

129 (7th Cir. 1985) (relying on the comprehensiveness of the Internal

-37-

Revenue Code's remedies for wrongful tax collection to bar *Bivens* action against IRS employees).  The Internal Revenue Code is an "applicable law" within the meaning of § 544(b)(1), and it preempts the use of state fraudulent transfer statutes to recover federal tax payments.

Indeed, preemption is all but compelled by I.R.C. § 7422(a), which provides that "[n]o suit . . . shall be maintained in *any* court for the recovery of *any* internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of *any* penalty claimed to have been collected without authority, or of *any* sum alleged to have been excessive or in *any* manner wrongfully collected, until a claim for refund . . . has been duly filed with the" IRS (and within the period specified in § 6511). (Emphasis added.)  As the Supreme Court said in *United States v. Clintwood Elkhorn Mining Co.,* 553 U.S. 1, 7, 128 S. Ct. 1511, 1516 (2008), "[f]ive any's in one sentence and it begins to seem that Congress meant the statute to have expansive reach."  Thus, even if § 544(b)(1) could be construed as permitting a trustee to recover a federal tax payment as a fraudulent transfer, the trustee may do to only if a "duly

-38-

filed" administrative refund claim had been filed, and no such claim has been filed in this case.[3]

The comprehensiveness of the Internal Revenue Code extends to suits by non-taxpayers as well.  In I.R.C. § 7426, for example, a person whose property has been wrongfully levied upon to satisfy the liability of a delinquent taxpayer may sue to recover his property, and that person may do so without a "duly filed" refund claim.  Thus, when Congress wants to provide non-taxpayers with a remedy for wrongful tax collection, it enacts a specific provision defining the remedy.  To be sure, a bankruptcy trustee may sue to recover tax payments under Bankruptcy Code §§ 547, 548, and 549 without an administrative refund claim, but preemption is implicated only with respect to state laws.  It does not apply when Congress explicitly authorizes, and carefully defines, the cause of action (in addition to unequivocally waiving the

---

[3]  Whether an unsecured creditor would be entitled to file an administrative refund claim to recover a federal tax payment as a fraudulent transfer need not be addressed in this case.  *Cf., United States v. Williams*, 514 U.S. 527, 115 S. Ct. 1611 (1995) (permitting, over the Government's objection, a woman who had paid her estranged husband's tax liability (in order to remove a tax lien from her home) to recover her payment under the Internal Revenue Code's refund procedures).  Neither the trustee nor any unsecured creditor of the debtor's bankruptcy estate filed such a claim seeking the return of payments 1 through 3.

-39-

Government's sovereign immunity).  A bankruptcy trustee's cause of action under § 544(b)(1), in contrast with §§ 547-549, is wholly derivative and is explicitly made subject to any "applicable law." Section 7422(a), by its sweeping language, is undoubtedly an applicable law governing the recovery of tax payments, and preempts the state fraudulent transfer law upon which the trustee relies.

In *In re Anton Motors, Inc.*, *supra*, the bankruptcy court relied upon a similar analysis when it concluded that a trustee, in reliance on § 544(b)(1), could not recover a state tax payment under Maryland's fraudulent-transfer law.  In that case, the court phrased the issue before it as "whether under Maryland law an unsecured creditor of the Debtor could have avoided as a fraudulent conveyance Debtor's tax payments." 177 B.R. at 64.  This statement of the issue is completely faithful to the plain language of § 544(b)(1).

The court in *Anton Motors* said that the trustee in substance was seeking a refund of local property taxes paid by the debtor on property owned by a corporate officer, and so, in order to determine whether an unsecured creditor of the debtor could recover those taxes, "it [was] necessary to consider Maryland law that is specifically applicable to the refund of tax payments."  *Id.*   The court determined that the Maryland

-40-

legislature had provided a statutory remedy to obtain tax refunds as

part of a comprehensive tax statute, and that those statutory provisions

for the recovery of voluntary tax payments are "exclusive."[4]  *Id.* at 65.

And, the court said, the legislature did not intend to supplant those

provisions when it enacted its fraudulent-transfer statute.  The court

thus concluded that "there has been neither a waiver nor an abrogation

of the County's immunity from a state law fraudulent conveyance action

to recover real property taxes." *Id.* at 66-67.

　　In *Abatement Environmental Resources*, *supra* n.2, the district

court in Maryland extended this "voluntary payment doctrine" to federal

tax payments, and explained that this was not an issue of "traditional

sovereign immunity."  301 B.R. at 832, n.2 & 835 n.6.  Because it

affirmed on a different ground, the Fourth Circuit said that it did "not

need to examine the district court's conclusion that Maryland's

'voluntary payment' doctrine serves as a bar."  102 Fed. Appx. at 280.

The argument advanced here is, in substance, a federal version of

---

　　[4]  Among the Maryland statutes that the court cited (177 B.R.
at 65) are Md. Tax-Prop. Code § 14-905 (which provides the form and
method of filing a refund claim); § 14-914 (which requires the filing of
an administrative claim); § 14-915 (which fixes the deadlines for filing
refund claims); and § 14-916 (which prohibits refunds if a timely claim
has not been filed).

-41-

Maryland's voluntary payment doctrine, *i.e.*, unless Congress explicitly provides otherwise, the Internal Revenue Code is the exclusive means for recovering federal tax payments.

In sum, § 106(a)(1) waives the United States' sovereign immunity "with respect to" § 544, but § 544(b)(1) allows an action by the trustee only if the transfer is voidable under applicable law by an unsecured creditor. Because I.R.C. § 7422(a) would bar an unsecured creditor from suing the United States to recover payments 1 through 3 where (as here) no administrative refund claim has been duly filed, the trustee cannot maintain such a suit.

## II

**The first seven tax payments made by the debtor were not constructively fraudulent, because the debtor was not operating with "unreasonably small capital" when the payments were made**

### A.    Introduction

Regardless of whether the Trustee's state-law fraudulent transfer claim falls within the scope of the waiver of sovereign immunity set forth in Bankruptcy Code §§ 106(a)(1) and 544(b), the bankruptcy court's findings that none of the first seven payments at issue rendered the debtor insolvent or left the debtor with unreasonably small capital

-42-

have ample support in the record, and should not be disturbed on appeal.

Constructive fraud is generally defined as an "unintentional deception or misrepresentation that causes injury to another." *Dahar v. Jackson*, 459 F.3d 117, 122 (1st Cir. 2006) (emphasis omitted), quoting *Black's Law Dictionary* 686 (8th ed. 2004); *see Collier on Bankruptcy*, ¶ 548.05 (16th ed. 2013) (constructively fraudulent transactions "may be free of actual fraud, but . . . are deemed to diminish unfairly a debtor's assets in derogation of creditors").  In contrast to "actual" fraud, in assessing constructive fraud, the court is required to assess objective factors, not actual intent.  *Dahar*, 459 F.3d at 122.  Because constructive fraud does not carry the stigma of actual fraud, the party alleging constructive fraud bears the burden of proving the elements by a preponderance of the evidence.  *Dahar*, 459 F.3d at 122-23; *Fidelity Bond and Mortg. Co. v. Brand*, 371 B.R. 708 (E.D. Pa. 2007); *Bakst v. Presley (In re E.D. Presley Corp.)*, 44 B.R. 781, 782 (Bankr. S.D. Fla. 1984).

Here, payments 1-3 were made in the first half of 2007, more than two years before the debtor filed its petition in bankruptcy.  The Trustee seeks to recover them under the Florida Uniform Fraudulent Transfer

9152933.1

-43-

Act.  Under FUFTA, constructive fraud occurs when "the remaining assets of the debtor were unreasonably small in relation to the [debtor's] business." Fla. Stat. § 726.105(1)(b).

Payments 4-7 were made in the first half of 2008, less than two years before the petition was filed.  The Trustee seeks to recover them under Bankruptcy Code § 548(a)(1)(B)(i)(II), which applies if "any property remaining with the debtor was an unreasonably small capital." Because there is no material difference between the two tests – "unreasonably small" remaining assets and "unreasonably small capital" – they may be analyzed together.  *In re McCook Metals, L.L.C.*, 2007 WL 4287507 at *12-*13 (N.D. Ill. 2007); *In re Toy King Distributors, Inc.*, 256 B.R. 1, 142 (Bankr. M.D. Fla. 2000); *see United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp.2d 106, 122 n.11 (E.D. Pa. 2011) ("[m]uch of the Uniform Fraudulent Transfer Act derives from the Bankruptcy Code, such that findings made under the Code regarding constructive fraud are applicable to UFTA actions").

## B.     The debtor did not have "unreasonably small capital"

"Unreasonably small capital" means "such meager assets that bankruptcy is a consequence both likely and foreseeable."  *Boyer v.*

-44-

*Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009)

(citations omitted).  In other words, the transaction must not leave the

debtor "with insufficient assets to have a reasonable chance of surviving

indefinitely."  *Id*. at 123; *see also Dahar*, 459 F.3d at 123 (debtor must

be able "to generate enough cash from operations and sales of assets to

pay its debts and remain financially stable" after the transfer; citations

omitted); *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056,

1070 (3d Cir. 1992) (" 'unreasonably small capital' would refer to the

inability to generate sufficient profits to sustain operations").  However,

the term is "fuzzy, and in danger of being interpreted under the

influence of hindsight bias.  One is tempted to suppose that because a

firm failed it must have been inadequately capitalized.  The temptation

must be resisted."  *Boyer* at 794 (citations omitted).  Whether a transfer

was fraudulent when made "depends on conditions that existed when it

was made, not on what happened later to affect the timing of the

company's collapse."  *Boyer* at 795 (citations omitted).

The sum of the first three payments at issue, made in April and

June of 2007, was $118,021.  As of June 2007, the debtor had, according

to the internal financial statements, working capital of $787,392.  (Ex.

47 at 38.)  For the first six months of 2007, the debtor had revenue in

9152933.1

-45-

excess of $7 million and net income of $729,052.  (Ex. 47 at 37.)  Those

figures, not disputed by the Trustee, are corroborated by Denson's

testimony that the debtor was financially healthy and prosperous

through mid-2007.  (AP 140 at 164, 183-84, 186.)  Indeed, the company's

good fortunes continued through the end of the year; even after the

Trustee's expert's adjustments, the debtor had net income in excess of

$600,000 in 2007, working capital of $730,153, and net worth (solvency)

of $815,055 at year-end.  (Ex. 47 at 37-38.)  There was no indication at

that time that the debtor would be unable to continue its operations;

indeed, all indications were to the contrary.  The bankruptcy court's

conclusion that "the Debtor was neither insolvent nor left with

unreasonably small capital at the time of the 2007 Payments" (AP 154

at 16) therefore is unassailable.  *See* Doc. 15 at 6 (finding "clear and

convincing support" for the bankruptcy court's conclusion that the

debtor did not have unreasonably small capital after the 2007

payments).

Payments 4-7, totaling $55,555.25, were made in April and June of

2008.  In June 2008, after making the payments, the debtor had,

according to the balance sheet as adjusted by the Trustee's expert

witness, working capital of $266,323.  (Ex. 47 at 38.)  For the six months

-46-

ended on June 30, 2008, the debtor had a net loss of $36,531.  (Ex. 47 at

37.)  While the debtor was not as prosperous as the previous year, the

salient fact is that the debtor still had, even by the expert witness's

reckoning, over a quarter of a million dollars in working capital.

Indeed, Denson testified that he was able to keep a cash cushion of

three to four months' expenses until the latter part of 2008.  (AP 140 at

182-84.)  The evidence thus indicates that in mid-2008 the debtor was

still able to meet its financial obligations and was not on the brink of

insolvency or bankruptcy.

In this regard, it is also significant that the debtor had no bank

debt until after June 2008.  (AP 140 at 183.)  It was not until the second

half of 2008 that the debtor found it necessary to draw on a bank line of

credit.  (AP 140 at 182-85, 187-88; Ex. 47 at 38.)  By the end of the year,

the debtor owed $633,809.  (Ex. 47 at 38.)  Banks do not knowingly lend

money to businesses on the brink of bankruptcy.  The availability of a

substantial line of credit indicates that in mid-2008 the debtor was not

facing imminent inability to pay its bills or continue operations.  *See*

*Moody*, 971 F.2d at 1072 n.24 ("the test for unreasonably small 'capital'

should include . . . all reasonably anticipated sources of operating funds,

which may include new equity infusions, cash from operations, or cash

-47-

from secured or unsecured loans over the relevant time period"; quoting Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind. L.R. 469, 496 (1988)); *Credit Managers Ass'n of S. Cal. v. Federal Co.*, 629 F. Supp. 175, 184 (C.D. Cal. 1985) (subsequent extension of credit supported finding that debtor did not have unreasonably small capital).

In concluding that the debtor did not have unreasonably small capital, the bankruptcy court accepted the adjustments the expert witness made to the debtor's financial statements, but rejected some of the expert witness's testimony. In particular, the bankruptcy court found that (1) evidence of the amount of the debtor's initial paid-in capital when it was formed in 2006, in the amount of $1,000, was "irrelevant" to the sufficiency of its capital when the payments at issue were made (AP 154 at 17); (2) the expert witness's opinion reflected "hindsight bias" towards the economic downturn that affected the construction industry during the time period leading up to the filing of the bankruptcy petition (*id.* at 18); (3) the expert witness's comparisons to industry financial ratios were flawed and therefore "questionable" and "of little use" (*id.* at 19); and (4) the debtor's access to cash alleviated the supposed "illiquidity" of its working capital (*id.* at 21).

9152933.1

-48-

The District Court held that the bankruptcy court "adequately considered and discredited" the expert witness's opinion, particularly in light of the fact that "the Trustee had the burden of proving the Debtor had unreasonably small capital." (Doc. 15 at 7.) The District Court also rejected the Trustee's argument that the bankruptcy court applied improper legal standards, finding that the Trustee "blurs the distinction between a refusal to consider evidence and discrediting evidence based upon the record." (*Id*. at 9.) Given the debtor's "working capital, access to credit, and lack of bank debt," the District Court stated that the bankruptcy court's findings as to the reasonableness of the debtor's capital were not "clearly erroneous." (*Id*. at 8.)

On appeal, the Trustee attacks (Br. 29-33) the findings of the bankruptcy court regarding the debtor's initial paid-in capital and the expert witness's "hindsight bias." According to the Trustee, due to the nature of the construction industry and the "perfectly foreseeable" economic downturn (Br. 31), the bankruptcy court severely underestimated the amount of capital that was reasonably necessary for debtor to survive. The record belies the Trustee's contentions.

As to the debtor's initial capitalization, the Trustee simply asserts that it was inadequate due to the "capital intensive" nature of the

-49-

construction industry (Br. 30) and the economic conditions the debtor

faced.  The Trustee, however, does not come to grips with the success

the debtor had in 2007, which gave it a substantial financial cushion.

As noted, even after the Trustee's expert's adjustments, the debtor had

net income in excess of $600,000 in 2007 and had working capital of

$730,153 and net worth of $815,055 at year-end.  (Ex. 47 at 37-38.)  The

Trustee does not contest those figures, except with the generalized

assertion (Br. 29) that there were "many problems with [those]

numbers."

It is apparent that $1,000 in initial capital was sufficient to allow

the debtor to establish a solvent and prosperous business.  The Trustee

provides no nexus between the initial capital (in 2006) and the debtor's

declining fortunes (in late 2008).  Moreover, the Trustee's argument

would divert the Court's attention from the issue presented – the

debtor's financial position *at the time the payments were made*.  The

bankruptcy court correctly characterized the initial capitalization as

"irrelevant" under the circumstances (AP 154 at 17), and the District

Court properly held that finding was "an entirely appropriate decision

for a fact-finder and was supported by other evidence, such as the

Debtor's financials and Denson's testimony."  (Doc. 15 at 7.)

9152933.1

-50-

To support the argument that more capital was needed due to the impending financial crisis, the Trustee relies (Br. 31) on this Court's decision in *Senior Transeastern Lenders v. Official Committee of Unsecured Creditors (In Re TOUSA, Inc.)*, 680 F.3d 1298 (11th Cir. 2012).  The Trustee contends (Br. 31) that in *TOUSA* "the construction industry's sharp decline [was] properly the basis for finding lack of adequate capital as completely foreseeable," mandating a similar conclusion here.  The Trustee relies on the Court's statement that "the bankruptcy of TOUSA was far more like a slow-moving category 5 hurricane than an unforeseen tsunami."  680 F.3d at 1312.

The Trustee, however, completely misses the point of *TOUSA*. The reasonableness of the debtor's capital was not at issue in that case. Rather, the issue was whether the debtor received "reasonably equivalent value" for a prepetition transfer.  There was no discussion in *TOUSA* of the reasonableness of the debtor's capital.

Moreover, TOUSA was one of the nation's largest homebuilders, 680 F.3d at 1301, and as such was vulnerable to broad trends in the housing market.  Unlike the debtor, TOUSA's sales in the first quarter of 2007 plunged more than 16 percent from the comparable quarter the previous year.  *Id*. at 1307.  In addition, in *TOUSA* the debtor was

9152933.1

-51-

heavily encumbered by debt; the bankruptcy court there found that the debtor was insolvent before the transaction at issue and "became even more deeply insolvent" as a result of the transaction.  *Id*. at 1303.  In contrast here, the debtor had no bank debt at the time of the payments. Finally, the Court in *TOUSA* did not overturn the bankruptcy court's factual findings; rather, it affirmed them.  *Id*. at 1311.  Thus, the heavy burden that must be met to overturn the bankruptcy court's factual findings was not met in *TOUSA*, as it was not met here.  In short, *TOUSA* involved a different issue and an entirely different set of facts. The District Court correctly observed that the differences between *TOUSA* and this case are "extensive," and correctly held that *TOUSA* "does not support the Trustee's position."  (Doc. 15 at 9.)

The Trustee asserts (Br. 32) that if the debtor was insolvent when the eighth and final payment was made, on September 15, 2008, as the bankruptcy court found (and as is no longer disputed), the debtor must have had unreasonably small capital when the seventh payment was made, on June 30, 2008.  "All that changed" in the interim, the Trustee contends, was that the debtor drew down $237,000 against its line of credit.

9152933.1

-52-

Insolvency is defined as an excess of liabilities over the fair market value of assets. *See* Bankruptcy Code § 101(32)(A); Fla. Stat. § 726.103(1). Taking out a loan adds equally to assets and liabilities. Thus, aside from the loan, the debtor's financial situation must have changed between the seventh and eighth payments; otherwise it could not have gone from being solvent to being insolvent. The debtor's balance sheet reflects as much, showing that the debtor was insolvent in the amount of $137,849 at the end of 2008. (Ex. 47 at 38.) The Trustee's argument thus rests on a faulty assumption.

In sum, the most important fact here is that even as late as seventh payment (in June 2008), the debtor had at least $266,000 in working capital. That fact alone is a strong indication that the taxpayer was not on the brink of being unable to continue its operations, the standard for "unreasonably small capital." While the Trustee asserts generally that the working capital figures are unreliable, she points to no hard evidence that it was reasonably foreseeable at the time the payments were made that the debtor would be unable to continue in business. Even if that may have been a reasonable inference based on the evidence, there are no grounds on which to overturn, as clearly erroneous, the bankruptcy court's finding that the debtor's capital was

9152933.1

-53-

not unreasonably small when payments 1-7 were made.  *See TOUSA*,

680 F.3d at 1311 (upholding bankruptcy court's factual finding as to the

sufficiency of the debtor's capital where "[i]n the light of all the

evidence, we are not left with the definite and firm conviction that the

bankruptcy court clearly erred"; internal quotation marks and citation

omitted); *Boyer* at 795 (mistakes made by buyer of business after

purchase were not relevant to reasonableness of capital at time of

purchase); *In re McCook Metals, L.L.C.*, 2007 WL 4287507 at *12-*13

(debtor did not have unreasonably small capital where only evidence

was expert's opinion and bankruptcy judge found flaws).

# III

### The final payment made by the debtor is not recoverable by the Trustee because the Internal Revenue Service was a "mere conduit"

### A.    Introduction

As the bankruptcy court held, the eighth and final payment made

by the debtor on account of Denson's individual tax liabilities, in the

amount of $26,380, occurred when the debtor was insolvent.  That

payment therefore is avoidable under Bankruptcy Code § 548 as

constructively fraudulent.  Transfers that are avoided may be recovered

from "the initial transferee of such transfer or the entity for whose

9152933.1

-54-

benefit such transfer was made."  Bankruptcy Code § 550(a)(1),

Addendum, *infra.*

That the eighth payment was made to the Internal Revenue

Service does not necessarily mean that the IRS is the "initial

transferee," because that term means "something more particular than

the initial recipient."  *In re Finley, Kumble, Wagner, Heine, Underberg,*

*Manley, Myerson & Casey*, 130 F.3d 52, 57 (2d Cir. 1997).  Many courts

"have recognized the distinction between the initial recipient – that is,

the first entity to touch the disputed funds – and the initial transferee

under section 550."  *Id*. at 56 (cases collected).  In particular, a party

acting merely as a conduit who facilitates the transfer from the debtor

to a third party is not a "transferee" and, therefore, not the initial

transferee within the meaning of § 550(a)(1).  *Collier on Bankruptcy*,

¶ 550.02(a); *see*, *e.g.*, *Nordberg v. Societe Generale (In re Chase &*

*Sanborn Corp.)*, 848 F.2d 1196, 1202 (11th Cir. 1988) (bank that

received funds from debtor was a mere conduit between the debtor and

the bank's customer and had no control over the funds); *Rupp v.*

*Markgraf*, 95 F.3d 936, 940 (10th Cir. 1996) ("courier" of check from

debtor to principal's creditor was not an initial transferee); *Security*

-55-

*First National Bank v. Brunson (In the Matter of Coutee)*, 984 F.2d 138

(5th Cir. 1993) (similarly as to law firm holding funds in trust account).

   This Court has adopted this equitable exception to the literal

statutory language of "initial transferee," and applied it to "initial

recipients who are 'mere conduits' with no control over the

fraudulently-transferred funds." *Martinez v. Hutton (In re Harwell)*, 628

F.3d 1312, 1322 (11th Cir. 2010).  The exception is firmly rooted in

principles of equity.  As the Court said in *Harwell,* 628 F.3d at 1322,

"this Court has adopted a flexible, pragmatic, equitable approach of

looking beyond the particular transfer in question to the circumstances

of the transaction in its entirety."  The Court adopted this approach

because it would be "inequitable" to render an initial recipient liable

where that recipient "could not ascertain the transferor debtor's

solvency, lacked any control over the funds, or lacked knowledge of the

source of the funds."  *Id*.  At bottom, this Court "examin[es] all the facts

and circumstances surrounding a transaction to prevent recovery from a

transferee innocent of wrongdoing and deserving of protection."  *Id*.

at 1322-23.

   Accordingly, recipients of a debtor's fraudulently transferred funds

who seek to take advantage of this exception "must establish (1) that

-56-

they did not have control over the assets received, *i.e.*, that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor and (2) that they acted in good faith and as an innocent participant in the fraudulent transfer."  *Id*. at 1323 (emphasis and footnote omitted).

### B.    The Trustee cannot recover the eighth payment because the IRS was a "mere conduit"

1.  The IRS received the payment at issue from the debtor on account of the estimated 2008 income tax liability of Denson.  As it turned out, Denson had no income tax liability for that year, so the IRS refunded the payment to him.  The bankruptcy court held that the IRS was the initial transferee of the payment, and thus was required to return the payment to the Trustee, even though Denson was then in possession of the funds.  The District Court reversed, holding that the IRS was a "mere conduit."  The District Court's decision is correct.

We are aware of only two cases addressing this issue in the context of federal tax payments: *United States v. Moyer (In re Regency Int'l Flooring, Inc.)*, 2010 WL 4053982 (W.D. Mich. 2010), and *Liebersohn v. IRS (In re C.F. Foods, L.P.)*, 265 B.R. 71 (Bankr. E.D. Pa.

-57-

2001).  In both cases, the IRS was held not liable as an "initial transferee" of the tax payments, but under different rationales.

In *C.F. Foods*, the bankruptcy court held that a payment made on account of the tax liabilities of the debtor's principal should be viewed in two steps, *i.e.*, as a transfer to the principal and a transfer from the principal to the IRS.  Because the principal of the debtor "took control of the debtor's funds and used them to satisfy income tax liabilities," the court held that the IRS was not an "initial transferee," but rather a subsequent transferee.  265 B.R. at 81.

*C.F. Foods* is contrary to the law of this circuit, as set forth in *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 598 (11th Cir. 1990).  The Court there stated that the extent of a principal's control over a debtor generally, and over the debtor's actions in transferring the disputed funds to the defendant in particular, is "entirely irrelevant to the 'initial transferee' issue."  Under that decision, the tax payment here may not be viewed as a transfer first to Denson, then to the IRS.  *See Bakst v. United States (In re Kane & Kane)*, 479 B.R. 617, 632 (Bankr. S.D. Fla. 2012) (the two-step theory is "not supported by controlling Eleventh Circuit precedent").

-58-

In *Regency*, on the other hand, the District Court adopted the

"mere conduit" theory, holding that the IRS was not an "initial

transferee" from whom such a tax payment may be recovered where, as

here, the corporation's payment of its owner's tax was later refunded to

the owner, and the trustee sought to recover the payment from the IRS

as a fraudulent conveyance.  Because bankruptcy courts are "courts of

equity that apply the principles and rules of equity jurisprudence"

(citing *Young v. United States*, 535 U.S. 43, 50, 122 S. Ct. 1036 (2002)),

the *Regency* court concluded that "Congress did not intend to require the

IRS to disgorge the amount of the payment twice, *i.e.*, once to the

taxpayer as a refund, and once to the Trustee under § 550(a)(1)."  *Ibid*.

Such a requirement would, the court observed, "requir[e] the taxpayers

as a whole to fund the debtor's estate," and would "invit[e] fraud on the

government."  *Ibid*.  The court reasoned that because the IRS had to

refund the payment to the principal, "it is logical to conclude that the

IRS never had dominion and control over the overpayment," but instead

"was a mere conduit for the payment of the refund" to the principal.

*Ibid*.  Because the IRS thus was not the "initial transferee" of the

payment, the court held that the trustee could not recover it.  *Ibid*.

-59-

2. The District Court below correctly adopted the reasoning of *Regency*. The District Court acknowledged that I.R.C. § 6402 "contains a statutory right of offset which allows the IRS to credit against a refund the amount a taxpayer owes for past taxes," but observed that here "the IRS had no discretion in whether to accept the payment on behalf of Denson or to refund the payment to him." (Doc. 15 at 13; footnotes omitted.) Looking at the transaction "in its entirety," the court stated, "the mere fact that Section 6402 allows an offset in certain situations does not preclude the determination that the IRS was acting as a mere conduit" when it received and refunded the payment at issue. (*Id*. at 13-14.)

The District Court acknowledged that tax payments such as this become available immediately for general use by the Government, and are commingled with other funds. (*Id*. at 14.) Nevertheless, the court held, "the IRS did not exercise sufficient control over the payment." (*Ibid*.) Again considering the transaction "in its entirety," the court held that "the IRS was acting as an intermediary which held the funds until Denson's tax liability could be assessed," and when it became clear that Denson had no tax liability, the IRS had no option but to refund the payment. (*Ibid*.) *See Bonded Financial Services, Inc. v. European*

-60-

*American Bank*, 838 F.2d 890, 893 (7th Cir. 1988) (holding that a bank

was not an initial transferee because it held funds "only for the purpose

of fulfilling an instruction to make the funds available to someone else");

*In re Toy King Distributors, Inc.*, 256 B.R. 1, 145 (Bankr. M.D. Fla.

2000) ("The conduit exception protects the innocent and uninvolved link

from strict liability for the avoided transfer and places that liability on

the next link in the chain").

The District Court further supported its conclusion by considering

the "unique role of the IRS" in "collecting taxes, funding the Treasury,

and processing refunds." (Doc. 15 at 16.) "Imposing a duty of due

diligence on the IRS to investigate the solvency of entities making

payments and the relationship to a tax payer," the court stated, "would

essentially cripple the efficiency of the IRS," would "further invite fraud

on the IRS by firms on the brink of bankruptcy," and, "[e]ven worse,"

would "require the IRS – and the taxpayers at large – to fund the

Debtor's estate." (*Ibid.*) *See In re Harwell*, 628 F.3d at 1322 ("it would

be inequitable to hold an initial recipient of the debtor's fraudulently-

transferred funds liable where that recipient could not ascertain the

transferor debtor's solvency, lacked any control over the funds, or lacked

9152933.1

-61-

knowledge of the source of the funds"; citing *In re Chase & Sanborn Corp.*, 848 F.2d at 1201).

For the reasons well explained by the District Court, the IRS should not be considered an "initial transferee" here. The IRS accepted the payment subject to the contingency that the payment would be refunded if it turned out that Denson had no tax liability, and that is what in fact happened. To impose upon the Government an obligation to refund the payment a second time would not only be fundamentally unfair, it would place the Government in the untenable situation of being required to monitor the capital and solvency of anyone who makes a tax payment for another. The purpose of allowing the Trustee to recover fraudulently conveyed prepetition payments from initial transferees is to protect creditors from debtors' diverting their assets to less deserving payees. *See Bonded Financial Services, Inc.*, 838 F.2d at 892. If, as was the case here, the recipient of the payment has no right to retain the payment, but instead serves as a mere conduit, with no reason to know that the payment works a fraud on creditors, it does not serve the purposes of the bankruptcy law to impose strict liability on that recipient.

9152933.1

-62-

In short, the Government established here (1) that it did not have control over the payment, *i.e.*, that it merely served as a conduit for the payment that was under the actual control of the shareholder-taxpayer, and (2) that it acted in good faith and as an innocent participant in the fraudulent transfer. *Harwell*, 628 F.3d at 1323. Accordingly, the District Court correctly held that the IRS was not an initial transferee from whom the Trustee could recover the eighth and final payment.

3. The Trustee relies on the fact that the IRS controlled the tax payment from the time it was received until the time a refund was requested. During that time, the Trustee asserts (Br. 17, 22-26), neither the debtor nor Denson "ha[d] any say or control whatsoever over how those funds are spent by the United States, any right to recover or receive them back, and ha[d] no right in them at all." The Trustee's literal interpretation of the term "initial transferee" ignores the equitable reasoning underlying the mere conduit exception. The mere fact that the payment was available for deposit and general use for a period of time does not offset the crucial fact that the IRS was under a duty to refund the payment if it turned out, as it did, that Denson had no liability. For that reason, the IRS lacked the dominion and control necessary to render it the "initial transferee."

9152933.1

-63-

The Trustee seeks (Br. 20) to distinguish this case from *In re Chase & Sanborn*, likening the IRS to a bank that applies a payment to a loan. *See* 848 F.2d at 1200. That would be analogous if the IRS had applied the payment at issue to Denson's tax liability. In that case, the IRS would not be a mere conduit, but rather would be a true transferee, and the policy of the bankruptcy law to undo preferential transfers would be served by allowing the Trustee to recover the payment. The fundamental unfairness of making a double refund and holding an innocent conduit responsible for the insolvency of its payor would not exist. Contrary to the Trustee's argument, the IRS here is in the same position as the bank in *Chase & Sanborn*, which received money deposited into a customer's account, never had actual control of the funds, and thus was not an initial transferee. 848 F.2d at 1200. The fact that the bank in *Chase & Sanborn* temporarily had custody of the funds did not mean that it was not a mere conduit. The same is true here.[5]

---

[5] In a similar vein, the Trustee argues (Br. 26) that the IRS's right to apply tax payments against other liabilities under I.R.C. § 6402(a) shows that it exercised dominion and control over the payment here. But if that had happened, the situation would be entirely different; if the payment had been applied against a tax liability and not refunded,

(continued...)

-64-

The Trustee's contention (Br. 24 n.3) that the United States could recover the payment from Denson by "declar[ing] the taxes unpaid" and bringing suit under I.R.C. § 7401 is incorrect.  Denson owed no taxes for the year for which the payment was made (2008), so there are no taxes to "declare unpaid."  Instead, it is the Trustee who has an alternative remedy; the "initial transferee" of the payment, in substance, is Denson (AP 140 at 106; Doc. 15 at 13), so the Trustee could try to recover the payment from him under Bankruptcy Code § 550(a).

---

[5](...continued)
the IRS would not have been a mere conduit.

-65-

# CONCLUSION

For the foregoing reasons, the case should be remanded with instructions to dismiss the complaint insofar as it relied on § 544 of the Bankruptcy Code, and the judgment of the District Court should otherwise be affirmed.  In the alternative, the judgment of the District Court should be affirmed in its entirety.

Respectfully submitted,

KATHRYN KENEALLY
  *Assistant Attorney General*

THOMAS J. CLARK          (202) 514-9084

*/s/ Kenneth W. Rosenberg*

KENNETH W. ROSENBERG    (202) 514-1919
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel*:

WILFREDO A. FERRER
  *United States Attorney*

MAY 2013

9152933.1

-66-

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[ X ]   this brief contains 13,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ]   this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ]   this brief has been prepared in a proportionally spaced typeface using WordPerfect X5 in 14-point Century Schoolbook, *or*

[ ]   this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


/s/  Kenneth W. Rosenberg

Attorney for the United States

Dated:  May 10, 2013

9152933.1

## CERTIFICATE OF SERVICE

It is hereby certified that, on this 10th day of May, 2013, this brief was filed with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, and seven (7) paper copies were sent to the Clerk by First Class Mail.  Service is made on counsel for the appellant via the CM/ECF system.


 /s/ Kenneth W. Rosenberg   
KENNETH W. ROSENBERG
*Attorney*

## ADDENDUM

Bankruptcy Code (11 U.S.C.):

§ 106.  Waiver of sovereign immunity.

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections . . . 544 . . . of this title.

.          .          .          .          .

§ 544.  Trustee as lien creditor and as successor to certain creditors and purchasers

.          .          .          .          .

(b)  (1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

.          .          .          .          .

§ 548.  Fraudulent transfers and obligations

(a)  (1)  The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)  (i) received less than a reasonably equivalent

-69-

value in exchange for such transfer or obligation; and

(ii)  (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

.          .          .          .          .

§ 550.  Liability of transferee of avoided transfer

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

.          .          .          .          .

9152933.1

-70-

Florida Statutes:

726.105.  Transfers fraudulent as to present and future creditors

(1)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

      (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

      (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

      1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

      2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

.       .       .       .       .

726.106.  Transfers fraudulent as to present creditors

(1)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

.       .       .       .       .

-71-

726.108. Remedies of creditors

(1)  In an action for relief against a transfer or obligation under ss. 726.101-726.112, a creditor, subject to the limitations in § 726.109 may obtain:

(a) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

.          .          .          .          .

9152933.1